Manuel KAPLAN; Carol Kaplan; MK Investments, Inc., Appellants,

v.

FIRST OPTIONS OF CHICAGO, INC., Appellee.

No. 92–1814.

United States Court of Appeals, Third Circuit.

Argued June 23, 1993.

Decided March 31, 1994.

Donald L. Perelman (argued), Richard A. Koffman, Fine, Kaplan & Black, Philadelphia, PA, for appellants.

Stephen P. Bedell, Timothy G. McDermott (argued), Gardner, Carton & Douglas, Chicago, IL and Walter M. Einhorn, Jr., Ballard, Spahr, Andrews & Ingersoll, Philadelphia, PA, for appellee.

Before STAPLETON, MANSMANN and HUTCHINSON, Circuit Judges.

## OPINION OF THE COURT

HUTCHINSON, Circuit Judge.

Appellants Manuel Kaplan, Carol Kaplan ("Kaplans"), and M.K. Investments, Inc. ("MKI"), appeal an order of the United States District Court for the Eastern District of Pennsylvania. It confirmed an arbitration award arbitrators appointed under the rules of the Philadelphia Stock Exchange ("the Exchange") had entered in favor of appellee First Options of Chicago, Inc. ("First Options").

The Kaplans argue that the arbitration panel lacked jurisdiction over them. First Options says that the Kaplans have waived any jurisdictional objections. Because they raised their objection to arbitral jurisdiction several times during the arbitration proceedings, we hold that the Kaplans have not

waived it. We also reject First Options' alternate argument that an agreement MKI signed as part of a "workout," meant to settle a dispute arising out of Mr. Kaplan's activities as a principal of MKI and a former member of the Exchange, evidences the Kaplans' consent to arbitrate and the Kaplans' individual liability for performance of the workout. There was no arbitration clause in the workout document the Kaplans signed.

First Options' argument that Mr. Kaplan's position as an officer of MKI compelled him to arbitrate his obligations under the workout as an "associated person" of a member, MKI, is also rejected. The record does not contain any U–4 Form or other document evidencing Mr. Kaplan's agreement to arbitrate, and the terms of the workout plainly show that he did not agree to submit his personal responsibility for MKI's obligations to arbitration.

In addition, we reject First Options' argument that Mr. Kaplan's former membership in the Exchange subjected him to arbitration under its rules relating to members. The only dispute that arose while Mr. Kaplan was a member was the dispute that led to the workout, not the dispute over the workout's performance that the arbitrators heard.

Finally, we reject First Options' argument that Mr. Kaplan is the alter ego of MKI. The evidence of failure to observe corporate formalities in some distributions MKI made to him is insufficient to show that MKI was a sham that Mr. Kaplan manipulated in fraud of creditors.

We will therefore reverse the district court's order confirming the arbitration award against the Kaplans and remand the case to it with instructions to enter an order granting the Kaplans' request to vacate the arbitrators' award against them as individuals.[1] We will, however, affirm the district court's order confirming the arbitration award as to MKI.[2]

---

1. In a separate order, we will deny the Kaplans' motion to strike certain exhibits and appendices from First Options' brief as well as First Options' motion to file a supplemental appendix.

2. *See infra* note 30.

## I. Factual & Procedural History

First Options is a "clearing firm" or "clearinghouse" and member of the Exchange. MKI, a Pennsylvania corporation, was an "options market maker"[3] on the Exchange from 1984 through 1989. First Options acted as MKI's clearing firm on the Exchange pursuant to a Market Maker's Agreement between MKI and First Options dated November 15, 1984. The Market Maker's Agreement, executed by Mr. Kaplan on behalf of MKI, provided in part that "any controversy between [First Options and MKI] arising out of [MKI's] business or this agreement . . . shall be submitted to and determined by arbitration. . . ." Appendix ("App.") at 73. Mr. Kaplan has been the president, a director and the sole shareholder of MKI since 1986. MKI has been a member of the Exchange since 1984. From November 8, 1981, to December 8, 1987, Mr. Kaplan was also a member of the Exchange individually.

On October 19, 1987, corporate equities suffered an unprecedented drop in value. Stocks traded on the New York Stock Exchange, and those traded on regional exchanges, crashed. The Philadelphia Stock Exchange was no exception. Five days before the crash, MKI's trading account had a balance or net equity of approximately $10.5 million. On October 19, 1987, MKI lost over $12 million and its account had a deficit of $2.1 million by the end of the trading day.

As the clearing firm for MKI, First Options guaranteed to the Exchange and the persons with whom MKI traded that all positions in MKI's accounts would be covered. After trading closed on October 19, 1987, First Options was at risk on the $2.1 million deficit in MKI's accounts.

First Options' agreement with MKI gave it the right to liquidate MKI's positions "whenever in [First Options'] discretion [First Options] deem[ed] it necessary." App. at 72.

Therefore, First Options took control of MKI's trading accounts and proceeded to liquidate any remaining positions which, in its opinion, posed significant unacceptable risks. First Options' liquidation of MKI's positions increased MKI's deficit to $5.1 million.

MKI and First Options had, in the meantime, entered into settlement negotiations about MKI's continued operation. First Options pressed Mr. Kaplan to assume personal liability for MKI's obligations. Mr. Kaplan refused. Instead, he and MKI disputed the size of MKI's deficit and claimed that First Options' mishandling of the liquidation was only increasing the deficit. During these negotiations, Mr. Kaplan and his counsel told First Options that neither MKI nor Mr. Kaplan had any liquid assets to contribute to any settlement or workout beyond MKI's interest in a joint trading account, certain exchange memberships and the 1987 federal income tax refund the Kaplans were anticipating.[4]

Negotiations continued during November and December and there is evidence that the parties reached a "handshake" deal in December. On December 8, 1987, Mr. Kaplan relinquished his membership on the Exchange and negotiations continued. On March 24, 1988, the Kaplans, MKI, and First Options separately executed four documents evidencing an overall method of settling the dispute that had resulted from MKI's October 19, 1987, deficit. They were: (1) a Letter Agreement executed by First Options, MKI, Mr. Kaplan, Mrs. Kaplan, and certain other entities and individuals; (2) a Guaranty executed only by MKI; (3) a Subordinated Loan Agreement executed by First Options, MKI, and a separate entity; and (4) a Subordinated Promissory Note executed by MKI. Only one of these four documents, the Subordinated Loan Agreement, contained an arbitration clause, and only First Options, MKI and the other entity, whose agreement to

---

**3.** An "options market maker" trades options for its own account. A market maker's trading is facilitated by a "clearinghouse." It provides administrative support and risk control services and guarantees a market maker's account to other traders. A clearinghouse is compensated in part by commissions generated by the market maker.

**4.** The expected refund may have been the result of MKI's problems. MKI was a Subchapter S corporation which passes its own income and losses through to its individual shareholders for inclusion in their individual tax returns.

arbitrate is not material to this case, signed that document.[5] Individually, Mr. and Mrs. Kaplan signed only the Letter Agreement. It did not have an arbitration clause.

Under the terms of the Workout:

—MKI agreed to repay a total of $6,227,188, the full amount of its trading deficits, including the added $3 million incurred while First Options' was liquidating its risky accounts;

—MKI immediately transferred four Exchange memberships to First Options;

—MKI and Mr. Kaplan immediately contributed $900,000 to a new Trading Account and MKI resumed trading on the new account in April 1988;

—Mr. Kaplan paid First Options $80,-000;

—Mr. and Mrs. Kaplan agreed to remit to First Options their 1987 tax refund, estimated to be at least $300,000, upon its receipt;[6] and

—MKI agreed to split its trading profits with First Options.

First Options agreed to release MKI from any claims First Options might have against it for the disputed debt upon MKI's performance of all its obligations under the workout. First Options also agreed to release Mr. Kaplan, individually, from any claims First Options might have against him beyond those he had undertaken in the workout.

MKI resumed trading in April of 1988. On January 16, 1989, before the parties had carried out all the terms of the March 1988 workout, MKI's account suffered another loss of over $1.5 million as a result of a takeover bid for one of the companies in whose stock MKI had a position.[7] In response, First Options ordered Mr. Kaplan to reduce MKI's risk by adjusting some of the positions in MKI's account. Mr. Kaplan did not reduce the risk in MKI's account to First Options' satisfaction.

On January 17, 1989, First Options again took over MKI's accounts and began to liquidate all its positions. First Options also barred MKI and Mr. Kaplan from conducting business on the Exchange and ordered all MKI traders off the trading floor. This second liquidation took about four months. It added $65,000 to the deficit that had been outstanding when the workout began.

After taking control of MKI, First Options demanded an opportunity to inspect MKI's corporate books and the Kaplans' tax returns. It also demanded payment of the $300,000 tax refund the Kaplans had agreed to turn over and contended Mr. Kaplan, along with MKI, was liable for all sums still due from MKI because they were alter egos of each other. The Kaplans refused First Options' demands, asserting that it was again compounding the problem by its ongoing liquidation of MKI's accounts. First Options then declared all sums still due under the workout accelerated and demanded immediate payment of the accelerated debt.

Ultimately, First Options submitted the dispute over the workout to the Exchange. It sought: (1) $6,292,421.60 from MKI for breach of contract; (2) $300,000, the amount of the Kaplans' 1987 tax refund, from the Kaplans individually; (3) $6,292,421.60 from Mr. Kaplan on the theory he was individually liable as MKI's controlling person; (4) $6,292,421.60 from Mr. Kaplan as MKI's alter-ego; plus (5) interest, costs, and attorneys' fees against MKI and the Kaplans.[8]

---

**5.** The arbitration clause in the Subordinated Loan Agreement provided in relevant part:

[A]ny controversy arising out of or relating to this [Subordinated Loan] Agreement, the Letter Agreement, the Subordinated Notes or any other document referred to herein or therein or the breach thereof shall be submitted to and settled by arbitration pursuant to the Constitution and Rules of the Exchange. The parties hereto and all who may claim under them shall be conclusively bound by such arbitration.

App. at 108–09.

**6.** This was Mrs. Kaplan's only obligation under the workout.

**7.** MKI was carrying large "short call" positions in securities of Texas Eastern Corp. These calls go down when the stock rises. On January 15, 1989, a takeover bid for control of Texas Eastern was announced. Its stock rose 50% above its January 14, 1989 closing price. The resulting decline in value of MKI's short calls caused the $1.5 million loss.

**8.** Though it claimed a right to recover its damages from either Mr. Kaplan or MKI, First Options would, of course, be entitled to only one recovery of the $6,292,421.60 damages claimed. In addition, it is apparent from the submission

MKI and First Options signed a submission agreement, separate and apart from the arbitration provision contained in the Subordinated Loan Agreement, submitting the case to the Exchange for arbitration. Mr. and Mrs. Kaplan have never signed any such agreement.

On July 24, 1989, the Kaplans and MKI filed responses denying liability, and Mr. Kaplan and MKI filed counterclaims against First Options, each seeking $10,000,000 from First Options for breach of contract, interference with prospective business opportunities and libel and slander. The Kaplans also submitted written objections to the arbitrators' jurisdiction under the Exchange's arbitration rules. In them, the Kaplans stated, "The Philadelphia Stock Exchange ... and the Arbitration Committee ... lack jurisdiction over this matter and the purported claim should be dismissed." App. at 311–12.

On February 26, 1990, not quite two years later, there was a pre-hearing discovery conference. The Kaplans' former counsel participated in it without renewing the objections to the arbitrators' jurisdiction. The Kaplans contend his limited participation in the discovery conference did not waive their objections to jurisdiction. Neither the Kaplans nor First Options submitted any documents to the Exchange that confirmed the Kaplans' withdrawal of their objections to the arbitrators' jurisdiction at the discovery conference or thereafter, and the arbitration panel's February 26, 1990, discovery order did not mention jurisdiction.

For the next twenty-two months, no discovery took place and no motions were filed; nor did the arbitration panel conduct any proceedings or issue any rulings before January 10, 1992. In December 1991, the Kaplans retained new counsel. On January 6, 1992, they filed a motion to dismiss for lack of jurisdiction. They also complained about the arbitrators' failure to rule on the objections they had filed two years earlier and said they were "reiterat[ing] and renew[ing]

that the only issue that affected Mrs. Kaplan was her liability for the $300,000 tax refund under the Letter Agreement. The submission of Mr. Kaplan's liability as a controlling person includ-

their objections to the Committee's jurisdiction." App. at 194.

In response to the Kaplans' motion to dismiss for lack of jurisdiction, First Options argued in the alternative that Mr. Kaplan was bound to arbitrate under Exchange rules because he was a member of the Exchange at the time of the October 19, 1987 crash, because he is an associated person of a member, or because he was MKI's alter ego. The Exchange denied the Kaplans' motion to dismiss for lack of jurisdiction without comment.

Sometime in May 1992, the matter finally proceeded to arbitration and, after eight days of hearings, the seven-member arbitration panel voted five to two to pierce the corporate veil and, on June 5, 1992, entered an award for $5,662,188.00 plus interest in favor of First Options and against Mr. Kaplan and MKI jointly and severally. The panel also ordered the Kaplans, jointly and severally, to remit their 1987 tax refund, $346,342.00, plus interest. Finally, it found for First Options on Mr. Kaplan's and MKI's counterclaims.

The Kaplans and MKI filed a petition to vacate the award in the district court and First Options filed a cross-petition for its confirmation. In an order accompanied by a memorandum opinion dated September 25, 1992, the district court confirmed the award. It held that Mr. and Mrs. Kaplan had consented to Exchange arbitration under the arbitration clause in the Subordinated Loan Agreement even though neither had ever signed that particular document. Alternately, the court held that the Kaplans' former counsel's participation in the 1990 discovery conference had waived their jurisdictional objections.

The district court then went on to affirm the arbitrators' decision to pierce the corporate veil on the merits. It also held, without explanation, Mr. Kaplan's release from individual liability was conditioned upon performance of the workout and that the release was ineffective because the workout had not been fully performed,[9] but explained that the

ed possible liability under the Exchange rules relating to "members" and "associated persons."

9. In deciding the issue of the arbitrators' jurisdiction, we do not reach the merits of whether

corporate veil would have been properly pierced even if the workout's provision released the Kaplans as individuals. The Kaplans and MKI filed a timely notice of appeal.[10]

## II. *Jurisdiction & Standard of Review*

The district court had subject matter jurisdiction over this action to confirm or vacate the arbitration award under 28 U.S.C.A. § 1332 (West 1993) and 9 U.S.C.A. §§ 9, 10 (West 1970 & Supp.1993). We have appellate jurisdiction over MKI's and the Kaplans' appeal from the final judgment of the district court confirming the award under 28 U.S.C.A. § 1291 (West 1993).

■ We review a district court's denial of a motion to vacate a commercial arbitration award *de novo. Colonial Penn Ins. Co. v. Omaha Indem. Co.,* 943 F.2d 327, 331 (3d Cir.1991); *Mutual Fire, Marine & Inland Ins. Co. v. Norad Reinsurance Co.,* 868 F.2d 52, 56 (3d Cir.1989) ("In reviewing the district court's denial of appellants [sic] motion to vacate the arbitration award, this Court will stand in the shoes of the district court and determine whether appellants were entitled to vacate the arbitration award pursuant to 9 U.S.C. § 10(d)."); *see also R.M. Perez & Assocs. .v. Welch,* 960 F.2d 534, 540 (5th Cir.1992); *Moseley, Hallgarten, Estabrook & Weeden v. Ellis,* 849 F.2d 264, 267 (7th Cir. 1988).

First Options asks us to reconsider these holdings and adopt instead the standard the United States Court of Appeals for the Eleventh Circuit uses. That court reviews decisions denying petitions to vacate arbitration awards for abuse of discretion. *See Robbins v. Day,* 954 F.2d 679, 681–82 (11th Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 201, 121 L.Ed.2d 143 (1992). We reject First Options' invitation. Even if this panel were to look favorably on the new standard it suggests, we could not adopt it. *See* Third Circuit Internal Operating Procedure 9.1 (1993) ("[N]o subsequent panel overrules the hold-

ing in a published opinion of a previous panel."). Only the Court *in banc* has power to change our present standard of review. *See* Third Circuit Internal Operating Procedures 9.1 (1993).

This Court has also held the district courts should independently decide whether an arbitration panel has jurisdiction over the merits of any particular dispute. In *International Brotherhood of Teamsters, Local 249 v. Western Pennsylvania Motor Carriers Association,* 574 F.2d 783 (3d Cir.), *cert. denied,* 439 U.S. 828, 99 S.Ct. 102, 58 L.Ed.2d 122 (1978), we stated:

> [W]hether the arbitrator has jurisdiction over a particular dispute—i.e. whether the controversy is arbitrable—is a question for the court to decide. A jurisdictional decision by an arbitrator that he has authority to decide a dispute is subject to a much broader and more rigorous judicial review. *Bieski v. Eastern Automotive Forwarding Co.,* [396 F.2d 32 (3d Cir.1968) ]. As we said in *Bieski:*
>
> > If, however, the private decision complained of is a "jurisdictional" one—that a certain dispute will not be considered on its merits by the private decision-maker— then the court is a proper forum to review this decision on the basis of its analysis of the contract entered into by the parties.
>
> *Id.* at 787 (quoting *Bieski,* 396 F.2d at 38) (citations omitted).

■ We will exercise plenary review over the district court's determination that the arbitration panel had jurisdiction over the Kaplans insofar as it turns on questions of law. *See Mellon Bank v. Farino,* 960 F.2d 1217, 1221 (3d Cir.1992). To the extent that the district court's determination of arbitral jurisdiction turns on findings of fact, however, our scope of review will be limited to whether those findings are clearly erroneous.

## III. *The Parties' Contentions*

The Kaplans argue that the Exchange's Arbitration Panel lacked jurisdiction over

---

the parties intended to release Mr. Kaplan unconditionally. *See infra* note 16.

**10.** Mr. Kaplan filed a petition in bankruptcy on February 2, 1993. Neither Mrs. Kaplan nor MKI

are in bankruptcy. On March 11, 1993, the bankruptcy court entered an order modifying the automatic stay to permit this appeal to go forward as to Mr. Kaplan.

them because they never consented to jurisdiction either in the course of the arbitration proceedings or under the Letter Agreement, the only workout document they signed. First Options, on the other hand, argues that the Kaplans waived any objection to the arbitrators' jurisdiction by voluntarily submitting the dispute to arbitration and withdrawing their objection to arbitral jurisdiction at the discovery conference. The Kaplans responded before the arbitration panel, the district court and now here that they had withdrawn the objection only for purposes of their participation in a discovery conference and participation in that limited way is not a waiver of their objection to the arbitrators' jurisdiction.

First Options also argues that this record establishes the Kaplans' consent to arbitration even if they did not waive their objection to jurisdiction. In support, it advances three alternate theories. Only the first applies to Mrs. Kaplan. They are: (1) the arbitration clause in the Subordinated Loan Agreement, one of the four documents embodying the workout, subjects the Kaplans to arbitration even though they did not sign it because the four documents refer to each other and must be read together as one agreement under general principles of contract law; (2) because Mr. Kaplan was a "member" of the Exchange at the time some of the underlying incidents occurred that led to the dispute which was the subject of the workout he consented to arbitral jurisdiction under the bylaws and rules of the Exchange requiring its "members" to arbitrate; and (3) Mr. Kaplan, as President of MKI, impliedly consented to arbitral jurisdiction under the bylaws and rules of the Exchange requiring an "associated person" of a member to arbitrate. Finally, First Options contends that Mr. Kaplan was an alter ego of MKI and therefore MKI's consent to arbitrate binds him. We will discuss each of these arguments in turn, beginning with waiver.

### IV. Waiver of Objection to Arbitral Jurisdiction

As one alternate basis for its conclusion that the arbitrators had jurisdiction over the Kaplans, the district court held their former counsel's participation in the 1990 discovery conference waived their objection to the arbitrators' jurisdiction.

█ A party does not have to try to enjoin or stay an arbitration proceeding in order to preserve its objection to jurisdiction. *See Pennsylvania Power Co. v. Local Union No. 272 of Int'l Bhd. of Elec. Workers,* 886 F.2d 46, 50 (3d Cir.1989); *Local 719, Am. Bakery and Confectionery Workers v. National Biscuit Co.,* 378 F.2d 918, 921–22 (3d Cir.1967); *see also Avis Rent A Car Sys., Inc. v. Garage Employees Union, Local 272,* 791 F.2d 22, 26 (2d Cir.1986) (citing *National Biscuit* for proposition that party does not have to seek stay of arbitration to preserve jurisdictional objection). Federal courts encourage participation in arbitration. Requiring parties to refuse to participate in order to challenge arbitral jurisdiction would not advance this goal.

█ A jurisdictional objection, once stated, remains preserved for judicial review absent a clear and unequivocal waiver. *See Pennsylvania Power Co.,* 886 F.2d at 50 (only where party has "clearly indicate[d] his willingness to forego judicial review" will court find waiver of jurisdictional objection) (quoting *National Biscuit,* 378 F.2d at 921–22). Therefore, where a party objects to arbitrability but nevertheless voluntarily participates in the arbitration proceedings, waiver of the challenge to arbitral jurisdiction will not be inferred. *Id.* In *Pennsylvania Power Co.,* Penn Power had objected to the arbitrability of an issue in its answer to a grievance before the arbitrator, the district court and the court of appeals. *Id.* In *International Brotherhood of Teamsters,* in contrast, both the Union and the Association signed a submission form specifying the issues that could be submitted to arbitration. This Court nevertheless held "the fact that the Union disputed [the arbitrators'] jurisdiction and argued the merits before [the arbitrators] does not constitute a waiver of its jurisdictional objections." *International Brotherhood of Teamsters,* 574 F.2d at 786 n. 2 (citing *National Biscuit,* 378 F.2d at 921).

█ The Kaplans refused to sign any submission form. They asserted their objection

to jurisdiction at the beginning of the arbitration proceedings. They reasserted it on the record before the arbitrators. Even if their former counsel withdrew the objections from consideration in order to participate in the discovery conference, neither that withdrawal or its scope is docketed or expressly noted in the arbitration record. Later, the Kaplans reasserted their objection in a motion to dismiss for lack of jurisdiction they filed in 1992, when the arbitration proceedings resumed. During the two years between the 1990 discovery conference and the Kaplans' reassertion of their objection, the case was dormant, without discovery, hearing, motion or ruling.

In January 1992, the arbitration panel denied the Kaplans' motion to dismiss for lack of jurisdiction without stating why. When the Kaplans spoke with the Exchange's Director of Arbitration about the motion, she said only that the denial was consistent with the Exchange Arbitration Panel's interpretation of jurisdiction. She did not mention waiver.

The district court initially thought the Kaplans' intentions concerning their objection to the arbitrators' jurisdiction were "at least somewhat ambiguous" when they chose to proceed with the 1990 discovery conference. App. at 627. It ultimately decided, however, that they had "clearly indicated their willingness to submit to the authority of the arbitration panel and forego any jurisdictional objections." [11] Memorandum Opinion ("Mem.Op.") at 13 (citing *Yorkaire, Inc. v. Sheet Metal Workers Int'l Assoc. Local Union No. 19*, 758 F.Supp. 248, 253 (E.D.Pa. 1990), *aff'd mem.*, 931 F.2d 53 (3d Cir.1991) (table)). In *Yorkaire*, the court held that an employer's objections to jurisdiction were waived once it had submitted to arbitration. *Yorkaire*, 758 F.Supp. at 255. There, the district court distinguished *Pennsylvania Power Co.* and *International Brotherhood of*

*Teamsters* because the parties in those cases had persistently reiterated their objections. Mem.Op. at 11–14, n. 7.

*Yorkaire* is materially different from this case, and the district court's reliance on it is misplaced.[12] In *Yorkaire*, the employer belatedly argued that the substance of a union grievance was not a matter over which the arbitration panel had jurisdiction. Despite numerous earlier opportunities to do so, the employer did not contest the panel's jurisdiction to determine what disputes it could hear until after the panel decided the case adversely to it. *Yorkaire*, 758 F.Supp. at 253–54. In *Yorkaire*, the record also showed the employer had initially agreed to submit the question of jurisdiction to the arbitration panel itself. *Id.* at 253. The district court held that a challenge belatedly raised after an adverse ruling, coupled with an express submission of the issue of jurisdiction to the arbitration panel, compelled a finding of waiver. *Id.* at 255; *cf. Bergquist Co. v. Sunroc Corp.*, 777 F.Supp. 1236, 1251 (E.D.Pa. 1991) ("at some point it would [be] unfair ... to allow [a party that was asserting an objection] to continue in the arbitration process, await an unfavorable decision, and then challenge the arbitration."). The Kaplans have not waited until an adverse decision to assert their objections. They have not clearly and unequivocally consented to arbitration.

This conclusion is supported by *International Brotherhood of Teamsters*. There, the parties had actually signed submission forms yet we held they had not waived their objections to the arbitrators' jurisdiction. *International Brotherhood of Teamsters*, 574 F.2d at 786 n. 2, 788. Here, the Kaplans reasserted their jurisdictional objection before commencement of the arbitration proceedings and again, two years later, before the panel heard any evidence, as soon as activity in the case had resumed. The Kaplans did not waive their objections. They reasserted

---

**11.** If this determination is treated as a finding of fact, it is clearly erroneous because the evidence does not support it if the proper standard of "clear and unequivocal waiver" is applied. If it is treated as the application of an incorrect legal standard, our review is plenary. Either way, it cannot stand.

**12.** Our affirmance of the district court in *Yorkaire* without opinion is, of course, not precedential. *See Galgay v. Gil–Pre Corp.*, 864 F.2d 1018, 1021 (3d Cir.1988). Our election to distinguish it, rather than to consider the validity of its rationale, does not indicate we approve or disapprove it.

them regularly during the arbitration proceeding. Repeated objection was not required while the case lay dormant. Their participation in the 1990 discovery conference did not waive their objections to the arbitrators' jurisdiction. We cannot say that this act "clearly indicated [their] willingness to forego judicial review." *Pennsylvania Power Co.*, 886 F.2d at 50.

■ Likewise, Mr. Kaplan's filing of a counterclaim against First Options in the arbitration does not waive his objection to the arbitrators' jurisdiction. We believe filing a counterclaim does not waive an objection to jurisdiction. *Bayou Steel Corp. v. M/V Amstelvoorn*, 809 F.2d 1147, 1149 (5th Cir.1987); *In re Arthur Treacher's Franchisee Litig.*, 92 F.R.D. 398, 413 (E.D.Pa.1981); *cf. Neifeld v. Steinberg*, 438 F.2d 423, 431 n. 17 (3d Cir.1971) (dicta). We think Mr. Kaplan had a right, without waiving his objection to the arbitrators' jurisdiction, to file a counterclaim to protect himself against the possibility that the arbitrators could rule against him on the merits of First Options' claims. The counterclaim is not a clear or manifest expression of his "willingness to forego judicial review." *Pennsylvania Power Co.*, 886 F.2d at 50.

The district court erred in holding that the Kaplans had waived their jurisdictional objection. Therefore, we turn to First Options' other arguments in support of the Exchange Arbitration Panel's jurisdiction over the Kaplans.

### V. *Consent*

■ Arbitration is fundamentally a creature of contract. *See, e.g., United Steelworkers v. Warrior and Gulf Navigation Co.*, 363

U.S. 574, 582, 80 S.Ct. 1347, 1352, 4 L.Ed.2d 1409 (1960). The Supreme Court has stated: "arbitrators derive their authority to resolve disputes only because the parties have agreed in advance to submit such grievances to arbitration." *AT & T Techs., Inc. v. Communications Workers*, 475 U.S. 643, 648–49, 106 S.Ct. 1415, 1418, 89 L.Ed.2d 648 (1986) (citation omitted). The Federal Arbitration Act makes written agreements to arbitrate "valid, irrevocable, and enforceable" on the same terms as other contracts. 9 U.S.C.A. § 2 (West 1970). There must be evidence sufficient to establish the parties' consent to arbitration. "As a matter of contract, no party can be forced to arbitrate unless that party has entered into an agreement to do so." *PaineWebber Inc. v. Hartmann*, 921 F.2d 507, 511 (3d Cir.1990). That agreement must be "express" and "unequivocal." *Par-Knit Mills, Inc. v. Stockbridge Fabrics Co.*, 636 F.2d 51, 54 (3d Cir.1980). On the other hand, doubts about the intended scope of an agreement to arbitrate are resolved in favor of arbitration. *See, e.g., Moses H. Cone Memorial Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24, 103 S.Ct. 927, 941, 74 L.Ed.2d 765 (1983).

■ An arbitrator's decision on the merits will be affirmed as long as it "draws its essence" from the contract. *Pennsylvania Power Co.*, 886 F.2d at 48; *see also Par-Knit*, 636 F.2d at 54. An arbitrator's decision to assert jurisdiction over objection is, however, subject "to a much broader and more rigorous judicial review" than an arbitral decision on the merits. Because it is "a question for the court to decide," it is subject to *de novo* judicial review. *International Brotherhood of Teamsters*, 574 F.2d at 787.[13]

---

13. *Pennsylvania Power Co.* is not to the contrary. Our statement there "[i]n considering the propriety of the arbitrator's decision on arbitrability, however, our review is subject to the same highly deferential standard we employ in reviewing arbitrators' rulings on the merits," *Pennsylvania Power Co.*, 886 F.2d at 48, must be read in light of the general understanding that jurisdiction is a question for the courts and our application of that principle in *International Brotherhood of Teamsters*. Moreover, in *Pennsylvania Power Co.* we recognized that a party with a jurisdictional objection should not be punished merely because that party proceeded with arbitration instead of

seeking a stay and immediate judicial review. *Id.* at 50. *International Brotherhood of Teamsters* sets forth clearly and persuasively the reasons that led this Court to review independently timely jurisdictional objections despite the fact that the arbitrators had also considered them. If *Pennsylvania Power Co.* were read to create a different standard, it would be in conflict with our earlier holding in *International Brotherhood of Teamsters*. *Cf.* Third Circuit Internal Operating Procedure 9.1 (1993) ("[N]o subsequent panel overrules the holding in a published opinion of a previous panel.").

First Options makes three separate contentions in support of its argument that the Kaplans, or at least Mr. Kaplan, as a matter of contract consented to the jurisdiction of the arbitrators. They are:

(1) the arbitration clause in the Subordinated Loan Agreement covers the Kaplans even though they did not sign it because it is an integral part of the four document package that makes up the workout the parties hoped would solve the problems arising out of MKI's October 19, 1987 deficit;

(2) Mr. Kaplan consented to arbitration under the Exchange rules because he continued to be an "associated person" of MKI, a continuing member of the Exchange throughout the abortive workout; and

(3) Mr. Kaplan consented to arbitration under the Exchange rules because he was a "member" of the Exchange when the October 19, 1987 dispute arose.

■ The district court considered only the first of the three, but in the end all three fail to come to grips with one significant set of material facts about which there is no genuine dispute. The record shows that from October 19, 1987 on, Mr. Kaplan persistently refused to take individual responsibility for MKI's obligations to First Options. There were negotiations from then until March 1988. During them, he offered to make some limited contributions to help eliminate the deficit MKI had incurred in the October 19, 1987 crash. That offer was accepted by First Options in March 1988 and its acceptance was formally embodied in the workout documents. These documents limited the Kaplans' obligations to the contribution of certain fixed sums and contained no promise to arbitrate. Thus, though we will separately consider all three of First Options' variations on the theme of consent, the common denominator which applies to all is the absence of any agreement to arbitrate in the only workout document the Kaplans signed as individuals.

## A. *The Arbitration Clause in the Subordinated Loan Agreement As Evidence of Consent* [14]

We begin with the argument in support of arbitration on a contract theory that the district court did consider. Did the arbitration clause in the Subordinated Loan Agreement MKI signed bind the Kaplans though they did not sign it? The district court said yes.

■ The workout had four documents. Only one, the Subordinated Loan Agreement, has an arbitration clause. MKI, not the Kaplans, signed the Subordinated Loan Agreement. First Options argues, however, that the arbitration clause in the Subordinated Loan Agreement nevertheless applies to the Kaplans. It says the four workout documents must be read together because they are all inextricably tied together as part of one transaction. It relies on the case of *Hagerman v. Schulte*, 349 Ill. 11, 181 N.E. 677 (1932). In *Hagerman*, the court stated:

> Where two or more contracts are part of the same transaction and relate to the same subject-matter, are known to all the parties, and are delivered at the same time to accomplish an agreed purpose, such contracts must be construed together as parts of the same transaction; and this is so even though the contracts are not executed between the same parties.

*Id.* 181 N.E. at 680. The four documents embodying the workout were all executed on March 24, 1988, for the same overall purpose. Therefore we agree with First Options that they should be construed together in accord with the unobjectionable general principle stated in *Hagerman*. On the other hand, we do not think *Hagerman* supports the proposition that an arbitration clause in a document signed by one party who has generally guaranteed performance of all the obligations other persons have individually undertaken

---

**14.** The Market–Maker Agreement with First Options which Mr. Kaplan had executed on behalf of MKI also has an arbitration clause providing "any controversy between [First Options and MKI] arising out of [MKI's] business or this agreement ... shall be submitted to and determined by arbitration." App. at 73. Neither Mr. Kaplan nor Mrs. Kaplan were parties to the Market–Maker Agreement.

binds those persons who have not signed the document that has the arbitration clause.

■ The circumstances of this case plainly negate the Kaplans' consent to arbitrate their individual responsibility for MKI's obligations. In the document they signed, they undertook only limited and precisely defined obligations. They eschewed any general responsibility for MKI's obligations. They did not sign any documents that stated they would arbitrate their individual liability under the workout. They have always contended they had no individual responsibility for any obligations MKI might have to First Options. Only MKI undertook overall responsibility. It did so in the Subordinated Loan Agreement signed only by it. The limited obligations the Kaplans did undertake in the workout document they signed indicates at least their belief that they are not individually and personally responsible for all the obligations of the workout. Unless both parties are in accord, there is no meeting of the minds from which an agreement could be found.

We think people intend to perform the obligations that are embodied in the words of the formal agreements they sign: no more, no less. The workout, read as a whole, does not evidence that the Kaplans consent to arbitrate their individual liability for all the obligations MKI assumed in the Subordinated Loan Agreement it signed.

There is no ambiguity about the absence of any consent to arbitrate in the documents the Kaplans signed individually. The Letter Agreement does no more than obligate them to contribute their individual 1987 tax refunds to the workout. Their failure to do so by March 31, 1989, may be a breach of the Letter Agreement and so constitute an "Event of Acceleration" under the Subordinated Loan Agreement MKI signed, but it does not impose on the Kaplans any obligation to arbitrate or any of the other obligations MKI agreed to. Thus, *Hagerman* does not help First Options.

The other cases First Options and the district court rely on are also inapposite. In reaching its decision that "[t]he Letter Agreement and the Subordinated Loan Agreement were executed in tandem, are inextricably intertwined and mutually dependent and must be read as a whole, particularly given the underlying circumstances and the relationships of the parties[,]" Mem.Op. at 11, the district court relied upon *Com-Tech Associates v. Computer Associates International, Inc.*, 753 F.Supp. 1078 (E.D.N.Y. 1990), *aff'd*, 938 F.2d 1574 (2d Cir.1991).

*Com-Tech* is distinguishable on much the same basis as *Hagerman*. Com-Tech and Computer Associates had signed a partnership agreement containing an arbitration provision. Computer Associates sought to compel Com-Tech to arbitrate a dispute arising out of a marketing agreement Com-Tech and it had signed along with the partnership agreement. Though the marketing agreement did not have an arbitration clause, activities under the marketing agreement were one of the things the partnership was formed to engage in. Accordingly, the court held the arbitration clause in the partnership agreement Com-Tech had signed covered disputes about transactions under the marketing agreement that were undertaken on the partnership's behalf. *Id.* at 1084.[15]

In the recent case of *Eli Pritzker v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 7 F.3d 1110 (3d Cir.1993), this Court held on agency principles that a party who did not sign the agreement out of which a dispute arose was nevertheless subject to arbitration under its arbitration clause. In *Pritzker*, the question was whether persons who acted wrongfully on behalf of their principal or without its authority could be compelled to arbitrate under an arbitration agreement the principal had signed. If First Options were still disputing Mr. Kaplan's responsibility for MKI's losses on October 19, 1987, *Pritzker* could be material. That is not the issue before us. Rather, it is the extent of Mr. Kaplan's obligations under the workout. Mr. and Mrs. Kaplan only contributed some of

---

**15.** On appeal, the United States Court of Appeals for the Second Circuit held Computer Associates had waived its right to avoid arbitration by participating in the arbitration process. According-

ly, it did not address arbitral jurisdiction. *Com-Tech*, 938 F.2d at 1575. Here, as we have demonstrated in Part IV., there is no waiver by the Kaplans.

their individual assets to the workout without assuming any overall responsibility for MKI's obligations. Their responsibility is based on contract, not agency.

Our statement "[b]ecause a principal is bound under the terms of a valid arbitration clause, its agents, employees, and representatives are also covered under the terms of such agreements" does not apply here. *Pritzker,* 7 F.3d at 1121 (citing *Arnold v. Arnold Corp.–Printed Communications for Business,* 920 F.2d 1269, 1281–82 (6th Cir. 1990); *Letizia v. Prudential Bache Secs.,* 802 F.2d 1185, 1187–88 (9th Cir.1986)). *Arnold* and *Letizia* were also decided on agency principles. *See Arnold,* 920 F.2d at 1281–82; *Letizia,* 802 F.2d at 1187–88. There, individual brokers were entitled to invoke their brokerage firms' right to arbitration in an action against the firm and its agents for fraud and violation of the federal securities laws. Here, the Kaplans' obligation to arbitrate depends on contract, not on agency or their participation with MKI in a wrongful act or statutory tort.

Moreover, in *Pritzker,* the non-signatories and the signatory's interests were co-extensive. That community of interest was material to our decision there. *See Pritzker,* 7 F.3d at 1122. Likewise, in *Isidor Paiewonsky Assocs., Inc. v. Sharp Properties, Inc.,* 998 F.2d 145 (3d Cir.1993), agents who had not themselves signed the arbitration agreement had interests largely co-extensive with those of their principals. *Sharp Properties,* 998 F.2d at 155. Here, only MKI assumed responsibility for all the obligations of the settlement. The Kaplans have always contended they were not individually liable for MKI's obligations and in the workout that contention was accepted. Thus, the Kaplans' breach could trigger MKI's obligations, but we do not think it could make their individual obligations coextensive with MKI's. The absence of an arbitration clause, or a cross-reference to it in the Subordinated Loan Agreement, in the document the Kaplans signed unambiguously shows their limited contractual obligation to provide funds to MKI was separate from and independent of MKI's obligations, including its express obligation to arbitrate.[16]

16. The Kaplans argue that differences in language in the release in the workout document they signed individually and language in MKI's release lead to the conclusion that the documents embodying the workout must be construed as treating MKI's corporate obligations separately from the Kaplans' individual obligations. First Options argues the Kaplans' release is conditional on the success of the workout. Mr. Kaplan's release read as follows:

> You [First Options] and your subsidiaries do hereby forever release, discharge, waive and forgive all actions, causes, [sic] of action, suits, accounts, demands, costs, expenses and other liabilities of any kind whatsoever, in law or in equity, which you or your subsidiaries may now have, or which you or your subsidiaries ever had, or which their respective successors or assigns, hereafter ever may have *against Mr. Kaplan* ..., for, upon or by reason of any activities relating to the Total Indebtedness ... *on or at any time prior to the date of the signing of this Agreement; provided, however, you and your subsidiaries do not release Mr. Kaplan or Larry Goldberg from complete performance of the terms of this Agreement and other documents contained herein and applicable to them.*

App. at 86 (emphasis added). MKI's release reads as follows:

> Upon termination of this Agreement, the release of or payment in full of the Subordinated Notes and other valuable consideration, re-

ceipt and sufficiency of which is hereby acknowledged, you [First Options] and your subsidiaries do hereby forever release, discharge, waive and forgive all manner of actions, ... damages, claims ... and other liabilities of any kind whatsoever, in law or in equity, which you or your subsidiaries may now have, or which you or your subsidiaries ever had, ... against MK ... for, upon or by reason of any activities relating to the Total Indebtedness, including the payment thereof, in the following accounts....

*Id.* at 85–86. Those differences may add some support to the Kaplans' argument that the arbitration clause in the workout document MKI signed does not bind them individually, but they are inconclusive. Accordingly, we do not rely on them.

Whether the release is conditional is not material on the arbitrators' jurisdiction over the Kaplans. The fact that is material on the arbitrators' jurisdiction is the absence of any arbitration clause in the agreements the Kaplans signed as opposed to its presence in the Subordinated Loan Agreement only MKI signed. On the merits the question whether the parties intended to release Mr. Kaplan from any liability on the losses MKI suffered October 19, 1987, in return for the contributions he and Mrs. Kaplan made to the workout or instead intended to preserve whatever rights First Options might have against him for his management of MKI if the workout failed could become material.

Arbitration was not among the obligations the Kaplans assumed as part of the workout. Indeed, First Options never argued before the arbitrators that the Kaplans could be compelled to arbitrate on an agency theory. If First Options' argument were accepted, every agent of a party who agrees to arbitration would have to arbitrate individual obligations assumed independently of the contract of agency.

The district court erred in holding the arbitration provision in the Subordinated Loan Agreement, a document the Kaplans did not sign, evidenced the Kaplans' consent to arbitrate their individual liability.[17] Thus, we go on to consider the effect the Exchange's bylaws may have on Mr. Kaplan, an issue the district court did not reach.

### B. *The Exchange's Bylaws As Evidence of Consent*

First Options contended before the arbitration panel and the district court that Mr. Kaplan was subject to the arbitrators' jurisdiction under the Exchange's bylaws and rules either as a "member" of the Exchange or as an "associated person" of a member. When the arbitration panel denied the Kaplans' motion to dismiss for lack of jurisdiction and went on to consider the dispute over performance of the workout on its merits, it did not give any rationale for its decision to assume jurisdiction.

After the district court held that the Kaplans had waived their jurisdictional objection and, alternately, that the arbitration panel had jurisdiction over the Kaplans by virtue of the arbitration clause in the Subordinated Loan Agreement, it had no occasion to address First Options' contention that Mr. Kaplan's individual membership in the Exchange before the workout was signed or his · continuing service as an officer of MKI thereafter showed his consent to arbitration. First Options, however, continues to press its contentions that these facts evidence consent in this Court and we must consider them.

The Supreme Court has stated the Securities and Exchange Commission has "expansive power to ensure the adequacy of the arbitration procedures employed by [a self-regulating organization]." *Shearson/Am. Express, Inc. v. McMahon*, 482 U.S. 220, 233, 107 S.Ct. 2332, 2341, 96 L.Ed.2d 185 (1987). The National Association of Securities Dealers ("NASD") and other regional exchanges, including the Philadelphia Stock Exchange, are self-regulatory organizations within the meaning of section 28(b) of the Securities Exchange Act of 1934, 15 U.S.C.A. § 78bb(b) (West 1981 & Supp.1993). Its members and their employees can unquestionably agree to arbitrate all disputes arising out of their use of the Exchange's trading facilities. *Creative Sec. Corp. v. Bear Stearns & Co.*, 671 F.Supp. 961, 966 n. 7 (S.D.N.Y.1987), *aff'd*, 847 F.2d 834 (2d Cir.1988); *Goldberg v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 650 F.Supp. 222, 225–26 (N.D.Ga.1986).

Nevertheless, " 'federal policy alone cannot be enough to extend the application of an arbitration clause far beyond its intended scope.' " *Haviland v. Goldman, Sachs & Co.*, 947 F.2d 601, 605 (2d Cir.1991) (quoting *McDonnell Douglas Fin. Corp. v. Pennsylvania Power & Light Co.*, 858 F.2d 825, 831 (2d Cir.1988)), *cert. denied*, —— U.S. ——, 112 S.Ct. 1995, 118 L.Ed.2d 591 (1992). In order to compel arbitration, we think there should be some evidence of agreement or consent to abide by the Exchange's rules before a member or associated person can be compelled to arbitrate. *See Tullis v. Kohlmeyer & Co.*, 551 F.2d 632, 635–37 (5th Cir.1977); *Coenen v. R.W. Pressprich & Co.*, 453 F.2d 1209, 1211 (2d Cir.), *cert. denied*, 406 U.S. 949, 92 S.Ct. 2045, 32 L.Ed.2d 337 (1972); *Cullen v. Paine, Webber, Jackson & Curtis, Inc.*, 587 F.Supp. 1520, 1522 (N.D.Ga.1984); *cf. Gateway Coal Co. v. United Mine Workers*, 414 U.S. 368, 374, 94 S.Ct. 629, 635, 38 L.Ed.2d 583 (1974) ("No obligation to arbitrate ... arises solely by operation of law. The law compels a party to submit his grievance to arbitration only if he has contracted to do so.").

---

17. Because this was the only potential basis other than waiver for the arbitrators' jurisdiction over Mrs. Kaplan, *see* Brief for Appellees at 23, First Options' remaining arguments do not affect her and therefore the district court's order confirming the arbitration award against her must be vacated.

·With this general principle in mind, we consider First Options' contentions that Mr. Kaplan has agreed to Exchange arbitration because of his status as (1) an "associated person" of MKI or (2) a "member" of the Exchange.

### 1. *Associated Person*

The Philadelphia Exchange's bylaws and rules do not define "associated person." [18] The Securities and Exchange Act of 1934, the authority for an individual exchange's self-regulating rules, *see* 15 U.S.C.A. §§ 78f(b), 78*o*–3(b)(8), 78s(g)(1), does. It defines "person associated with a member" or "associated person of a member" as "any partner, officer, director, or branch manager of such member (or any person occupying a similar status or performing similar functions), any person directly or indirectly controlling, controlled by, or under common control with such member, or any employee of such member." 15 U.S.C.A. § 78c(a)(21) (West 1981).[19]

■ First Options is correct in asserting that Mr. Kaplan is an associated person within the meaning of the Act and the Exchange's rules, including its rules concerning arbitration. The Philadelphia Exchange bylaws and rules were adopted pursuant to the Securities and Exchange Act. Therefore, Mr. Kaplan is without doubt an "associated person" of MKI. Mr. Kaplan continued to be an associated person of MKI as one of its

directors, its president, and its sole shareholder after the workout was signed.

First Options argues the Exchange's adoption of a rule including an arbitration provision is all that is needed to require an associated person to arbitrate. If First Options is right, no separate agreement or other evidence of Mr. Kaplan's consent to arbitrate is necessary.[20] His consent to the Exchange's rules on arbitration can be implied from his position as chief executive of MKI. *See Pearce v. E.F. Hutton Group, Inc.*, 828 F.2d 826, 830 (D.C.Cir.1987) (phrase "associated person" is "not defined in the NYSE rules, but its use therein is clearly meant to draw on the definition found in the Securities Exchange Act of 1934, which defines it to mean 'any partner, officer, director, or branch manager' of a member firm") (quoting 15 U.S.C.A. § 78c(a)(21)); *see also Haviland*, 947 F.2d at 608 (Walker, J., dissenting) (same).

■ We do not think Exchange Rule 950 § 6(a)(2) requires Mr. Kaplan to arbitrate the dispute with First Options over the workout absent other evidence that he has individually agreed to submit to arbitration this particular dispute over his continuing individual responsibility for MKI's obligations. The workout documents themselves not only fail to furnish that evidence, they negate his consent to arbitration.[21] Because of the nature of this particular dispute and the terms of the workout documents that govern it, we

---

**18.** The NASD Bylaws, in contrast, specifically define "person associated with a member" as: every sole proprietor, partner, officer, director, or branch manager of any member, or any natural person occupying a similar status or performing similar functions, or any natural person engaged in the investment banking or securities business who is directly or indirectly controlling or controlled by such member, whether or not any such person is registered with [NASD] pursuant to these By–Laws[.] *Tays v. Covenant Life Ins. Co.*, 964 F.2d 501, 502 (5th Cir.1992) (quoting NASD By–Laws, Art. I(m)).

**19.** This argument is encompassed in First Options' and MKI's submission of the issue of Mr. Kaplan's liability as a "controlling person" to the arbitrators.

**20.** Section 1 of Rule 950 of the Philadelphia Stock Exchange Rules, entitled "Matters Eligible for Submission," does not expressly refer to "as-

sociated persons." We think though that its reference to "others" includes "associated persons." Section 6, entitled "Required Submissions," does expressly include "associated persons." *Compare* PHLX Rule 950 § 1 (Aug. 1991) *with* PHLX Rule 950 § 6(a). Because Section 1, setting forth "Matters Eligible for Submission," does not expressly state disputes involving associated persons are eligible for submission, it has been argued in other cases that disputes with associated persons are not "eligible" for submission despite Section 6. The United States Court of Appeals for the Fifth Circuit noted the problem but did not need to decide the issue under a similar provision of the NASD Code that explicitly limited eligible disputes to those listed in Section 1. *See Tays*, 964 F.2d at 502–03.

**21.** *See* Part V.A. *supra.*

conclude Mr. Kaplan was not required to arbitrate this matter.

Most of the cases that have considered whether persons associated with members of an exchange must arbitrate a dispute involving the exchange or the use of its facilities have required evidence other than the rule itself to show the associated person's consent to arbitrate. The courts deciding these cases have relied on the associated person's execution of a Uniform Application for Securities and Commodities Industry Representative and/or Agent ("U–4 Form") or a provision in an exchange membership application to show consent. In the standard U–4 Form, an employee expressly agrees to abide by all the exchange rules and submit disputes involving it or a member to arbitration.[22] *See, e.g., Haviland,* 947 F.2d at 604 (relying on employee's U–4 Form in exchange member brokerage firm); *Pearce,* 828 F.2d at 830 (looking to U–4 Form of branch office manager in member brokerage firm); *Tullis,* 551 F.2d at 634 n. 4 (looking to allied membership application of former partners in exchange member firm in liquidation); *Coenen,* 453 F.2d at 1211–12 (relying on statement in application of officer of NYSE exchange member to be admitted to "allied" membership under NYSE rules); *Cullen,* 587 F.Supp. at 1523 (relying on U–4 Form of general securities representative employee in exchange member firm); *see also Banque de Gestion Privee SIB v. TransOptions Co.,* No. 92 C 5252, 1993 WL 96453 (N.D.Ill. March 29, 1993) (arbitration not compelled in absence of arbitration clause in partnership agreement, filing of U–4 Form by partners or exchange member's express identification of partners as associated persons in filings with exchange).[23]

Where, as here, the arbitration involves an obligation the officer has undertaken separately and independently of his acts as an agent of the member that employs him, we believe some evidence of an associated person's consent to arbitrate beyond his or her employment as an agent or executive of a member must appear.

First Options' reliance on *Goldberg v. Donaldson, Lufkin & Jenrette Sec. Corp.,* 650 F.Supp. 222 (N.D.Ga.1986), in support of its argument that Mr. Kaplan is subject to arbitration because he is an associated person of MKI, is misplaced. There was no dispute about Goldberg's consent to arbitrate. It was shown by his signature on a U–4 Form.[24] *Id.* at 226.

The record before us does not have any independent evidence of Mr. Kaplan's agreement to arbitrate the question of his responsibility for MKI's obligations. No U–4 Form nor any other document signed by Mr. Kaplan shows he had agreed to arbitrate this particular dispute once he relinquished his own membership on the Exchange in December 1987.

Mr. Kaplan's status as an associated person of MKI did not evidence his individual agreement to assume the broad obligation to arbitrate that MKI expressly undertook when it signed the Subordinated Loan Agreement. Under the circumstances of this

---

**22.** The standard U–4 Form provides in part:

> [A]ny controversy between me and any member or member organization or affiliate or subsidiary thereof arising out of my employment or the termination of my employment shall be settled by arbitration at the instance of any such party in accordance with the arbitration procedures prescribed in the Constitution and Rules then obtaining of the New York Stock Exchange, Inc.

*Pearce,* 828 F.2d at 828 (emphasis omitted). It appears customary to have a prospective employee sign and submit a standard U–4 Form to the Exchange in order to obtain such employment. *See id.*

**23.** We do note that some cases require an associated person to arbitrate without discussing the

need for a U–4 Form or other independent evidence of consent. *See, e.g., Swink & Co. v. Hereth,* 784 F.2d 866, 868 (8th Cir.1986) (requiring arbitration under municipal securities code rules between broker/dealer and its officer because officer was associated person without mention of U–4 Form or other independent evidence of officer's consent to arbitrate). None of them state, however, that additional evidence of consent is not needed. The point is simply not discussed.

**24.** Goldberg was a plaintiff who objected to arbitration. He did so primarily because he was no longer either a NASD member or an associate of a member once his firm had become defunct. He argued that his dispute did not arise as a broker or dealer but out of his activities as an individual investor who had not agreed to arbitration. *Goldberg,* 650 F.Supp. at 226.

case, we reject First Options' argument that we can imply Mr. Kaplan's consent to arbitrate his individual liability for MKI's obligations under the workout from his association with MKI, the only party to the dispute who was still a member when the workout documents were signed.

### 2. *Member*

■ First Options argues alternately that Mr. Kaplan's individual membership in the Exchange at the time of the crash that precipitated MKI's problem provides the necessary consent to arbitrate. There was a provision in Mr. Kaplan's membership agreement consenting to the Exchange rules, including its rules on arbitration; but Mr. Kaplan's Exchange membership ended in December 1987, several months before execution of the workout documents. *See Tullis,* 551 F.2d at 636–37; *Coenen,* 453 F.2d at 1211 (membership application requiring signatory to abide by exchange rules shows consent to arbitrate).

First Options says the December 1987 termination of Mr. Kaplan's Exchange membership does not matter. It argues he is still subject to arbitral jurisdiction under Exchange Rule 950 because the circumstance that caused this dispute, the October 1987 stock market crash, happened when he was a member. First Options relies on a commentary to the applicable version of Rule 950, which was in effect until June 20, 1991. It stated: "For purposes of this Rule, the terms member, member organization and associated person of a member, shall be deemed to encompass those persons who were Exchange members at the time the circumstances occurred which gave rise to the controversy." PHLX Rule 950, Commentary .01. This commentary is consistent with case law holding that the membership which is material is membership at the time the events giving rise to the controversy occur. *Cf. Muh v. Newburger, Loeb & Co.,* 540 F.2d 970, 973 (9th Cir.1976).

It is a dispute over Mr. Kaplan's performance under the workout that is now before us, or perhaps more specifically a dispute over whether the only obligations which survive the workout are those each of the parties undertook in the separate documents they signed to formalize the workout, rather than the earlier dispute over the deficit in MKI's account which arose as a result of the October 19, 1987 stock market crash. We think the workout documents independently define and limit the obligations Mr. Kaplan and MKI independently assumed. Under them MKI retained all the obligations it had as a result of the October 19, 1987 events. Therefore, the workout document the Kaplans signed negates any intent on their part to arbitrate their individual responsibility for MKI's obligations.[25]

First Options did not seek arbitration of the original dispute while Mr. Kaplan was still a member of the Exchange. Instead, it agreed to the terms in the workout documents. They did not contain any agreement by Mr. Kaplan to arbitrate the question of his individual liability for MKI's obligations.

Here again, First Options' reliance on *Goldberg,* 650 F.Supp. at 225–26, is misplaced. That case concerned Goldberg's obligation to arbitrate a dispute about events that occurred while he was still a member or an associated person of an exchange member. *Id.* at 226 (citing *O'Neel v. National Assoc. of Sec. Dealers, Inc.,* 667 F.2d 804, 807 (9th Cir.1982); *Isaacson v. Hayden, Stone Inc.,* 319 F.Supp. 929 (S.D.N.Y.1970)). The *Goldberg* court did not have to consider the effect of an intervening agreement that defined Goldberg's individual obligations without providing for arbitration. The dispute about Goldberg's activities while he was an active member of the Exchange was uninterrupted. Mr. Kaplan terminated his membership before the workout documents were executed. They contained no agreement to arbitrate. The dispute before us concerns an alleged breach of the workout, not the events that led to it.

---

**25.** We note again that this conclusion does not depend on whether the releases in the workout were conditional upon performance of the parties' individual obligations under the workout.

We assume they were, but it does not follow from that condition that any pre-existing obligations were reinstated.

First Options cannot turn the clock back to the date of the stock market crash in order to require Mr. Kaplan to submit to arbitration because he was then bound by its rules as an exchange member. Accordingly, we reject First Options' contention that Mr. Kaplan's membership in the Exchange before execution of the workout subjects him to arbitration for breach of the workout document he signed after his membership terminated.

## VI. *Mr. Kaplan as an Alter Ego of MKI*

██ Finally, we consider First Options' argument that Mr. Kaplan was subject to binding arbitration as MKI's alter ego. The arbitrators accepted this contention after it was conceded that they had jurisdiction over MKI. They then resolved the alter ego issue against Mr. Kaplan on its merits. If they did so correctly, they would have jurisdiction to subject Mr. Kaplan to all the obligations MKI assumed in the Subordinated Loan Agreement, including its obligation to arbitrate. *See Interocean Shipping Co. v. National Shipping & Trading Corp.*, 523 F.2d 527, 539 (2d Cir.1975) ("In an appropriate situation, the corporate veil may be pierced and a party may be held bound to arbitrate as the signatory's alter ego.") (citing *Fisser v. International Bank*, 282 F.2d 231, 233–34 (2d Cir.1960)), *cert. denied*, 423 U.S. 1054, 96 S.Ct. 785, 46 L.Ed.2d 643 (1976); *see also Dighello v. Busconi*, 673 F.Supp. 85, 89 (D.Conn.1987), *aff'd mem.*, 849 F.2d 1467 (2d Cir.1988). But neither this Court nor the district court is bound by the arbitrators' determination that Mr. Kaplan was the alter ego of MKI. He is entitled to an independent judicial determination of that issue. *Laborers' Int'l Union v. Foster Wheeler Corp.*, 868 F.2d 573, 575–77 (3d Cir.1989) (per curiam) (right to independent judicial determination of arbitrator's jurisdiction based on alter ego status); *Sheet Metal Workers Intern. Assoc., Local No. 359 v. Arizona Mechanical & Stainless, Inc.*, 863 F.2d 647, 653 (9th Cir.1988); *see also International Brotherhood*, 574 F.2d at 787.

██ The district court concluded "[e]ven if [First Options had unconditionally released Mr. Kaplan from any liability for the debt in the Workout Agreement], it would not release MKI from liability for the debt and, on the record adduced, would not preclude a piercing of the corporate veil." Mem.Op. at 27. The district court felt "[i]t cannot be said the arbitration panel's decision to pierce the corporate veil was a decision made in manifest disregard of the law." *Id.* We think the district court erred when it used manifest disregard of the law as the standard for judging the arbitrators' alter ego conclusion.[26] Instead, it should have determined the issue *de novo*. Manifest disregard applies when a court reviews the merits of an arbitrators' decision. It does not apply to judicial review of an arbitration panel's conclusion that one person is the alter ego of another for jurisdictional purposes. On those issues, courts review the record independently of the arbitrators. Therefore, we must consider the sufficiency of the evidence to show that MKI and Mr. Kaplan were alter egos under a standard less deferential than manifest disregard.

██ We begin with the proposition that generally a shareholder is not personally

---

**26.** The district court did not confirm the arbitral award against the Kaplans without giving the parties an opportunity to present additional evidence. The parties agreed arbitral record was sufficient to permit the district court to make any required findings of fact. When the district court affirmed the arbitrators' conclusion that Mr. Kaplan and MKI were alter egos, it did not consider the alter ego theory from the standpoint of arbitral jurisdiction. Having already held that the jurisdiction issue was waived, or alternately that the arbitration provision in the Subordinated Loan Agreement required the Kaplans to arbitrate, it confirmed the arbitrators' alter ego decision on its merits. If it had correctly reached the merits, it would have correctly used manifest disregard as the standard of review. *See Carte Blanche (Singapore) Pte., Ltd. v. Carte Blanche Int'l, Ltd.*, 888 F.2d 260, 265 (2d Cir.1989). On the issue of the arbitrators' jurisdiction over Mr. Kaplan, however, it should have considered the record independently. So considered, we conclude that the evidence is insufficient to permit a finding that Mr. Kaplan and MKI were alter egos. Any conclusion to that effect by the district court, even if treated as a finding of fact, would be clearly erroneous if the evidence that Mr. Kaplan ignored corporate formalities and manipulated MKI's affairs to defraud its creditors is legally insufficient to support the alter ego conclusion under our case law on the subject.

liable to perform corporate obligations. The corporate veil is pierced only when "the corporation was an artifice and a sham to execute illegitimate purposes and [an] abuse of the corporate fiction and immunity that it carries." *Wheeling–Pittsburgh Steel Corp. v. Intersteel, Inc.*, 758 F.Supp. 1054, 1058 (W.D.Pa.1990) (citing *Zubik v. Zubik*, 384 F.2d 267 (3d Cir.1967), *cert. denied*, 390 U.S. 988, 88 S.Ct. 1183, 19 L.Ed.2d 1291 (1968)). "In deciding whether to pierce the corporate veil, courts are basically concerned with determining if equity requires that the shareholders' traditional insulation from personal liability be disregarded and with ascertaining if the corporate form is a sham, constituting the facade for the operations of the dominant shareholder." *Id.* at 1057 (citing *Carpenters Health & Welfare Fund v. Kenneth R. Ambrose, Inc.*, 727 F.2d 279 (3d Cir.1983)).

■ The alter ego concept is a "tool of equity [that] is appropriately utilized 'when the court must prevent fraud, illegality or injustice, or when recognition of the corporate entity would defeat public policy or shield someone from public liability for a crime.'" *Carpenters Health & Welfare Fund*, 727 F.2d at 284 (quoting *Publicker Indus., Inc. v. Roman Ceramics Corp.*, 603 F.2d 1065, 1069 (3d Cir.1979)) (internal quotation omitted). Events that permit the corporate veil to be pierced include:

> "failure to observe corporate formalities, non-payment of dividends, insolvency of the debtor corporation at the time, siphoning of funds of the corporation by the dominant shareholder, non-functioning of other officers or directors, absence of corporate records, and the fact that the corporation is merely a facade for the operations of the dominant stockholder or stockholders."

*United States v. Pisani*, 646 F.2d 83, 88 (3d Cir.1981) (quoting *DeWitt Truck Brokers v. W. Ray Flemming Fruit Co.*, 540 F.2d 681, 686–87 (4th Cir.1976)). In addition, courts sometimes consider undercapitalization. *Id.*

■ Not every disregard of corporate formalities or failure to maintain corporate records justifies piercing the corporate veil. That remedy is available only if it is also shown that a corporation's affairs and personnel were manipulated to such an extent that it became nothing more than a sham used to disguise the alter ego's use of its assets for his own benefit in fraud of its creditors. In short, the evidence must show that the corporation's owners abused the legal separation of a corporation from its owners and used the corporation for illegitimate purposes. *See Zubik*, 384 F.2d at 267.

The testimony the arbitrators heard about Mr. Kaplan's personal use of MKI's corporate funds dealt largely with acts that took place in 1986 and 1987, before execution of the workout.[27] It consisted of:

—a withdrawal of $350,000 from MKI's trading account and a deposit of $361,000 into Mr. Kaplan's own account on the same day

—a check drawn on MKI's trading account that was traceable to Mr. Kaplan's purchase of a house

—a check for $1.4 million Mr. Kaplan wrote on his own checking account to cover a margin call on MKI for about that amount

—a transfer of $125,000 from MKI's trading account to Mr. Kaplan's personal account on which he then wrote checks totalling $125,000 to pay individual federal and state income taxes

—checks for $611,000 drawn to Mr. Kaplan on MKI's corporate account during the eight weeks that followed the October 19, 1987 crash when MKI appeared to be insolvent

—withdrawals aggregating $4.5 million from MKI's corporate account between February 1986 and January 1989 for Mr. Kaplan's personal use.

*See* Mem.Op. at 25–26.

Mr. Kaplan argues that withdrawal of some corporate funds for personal use before

---

27. Kevin McCarthy, an investigating accountant and CPA, provided most of the testimony concerning these transactions. He testified that he reviewed MKI's and Mr. Kaplan's financial information from February 1986 to January 1989,

when MKI lost its trading ability, because those were the only years for which such information was readily accessible. Thereafter, there was little activity in MKI's accounts.

the workout documents were executed cannot make him liable for MKI's obligations as its alter ego because the workout could not be breached before it was signed. Though we think that argument lends some support to Mr. Kaplan's arguments against liability on an alter ego theory, it is not the whole answer to First Options' alter ego argument.

Neither are *Chicago Florsheim Shoe Store Co. v. Cluett, Peabody & Co.,* 826 F.2d 725, 727–28 (7th Cir.1987), and *Connors v. Peles,* 724 F.Supp. 1538, 1559–61 (W.D.Pa.1989), the cases on which First Options primarily relies to support the alter ego theory. They stand only for the general proposition that alter ego status is determined by conduct of the parties that is material to the dispute at hand. They are not controlling on whether Mr. Kaplan's failure to observe some corporate formalities before the present dispute over performance of the workout arose is material to its resolution.

On this record, however, we think Mr. Kaplan's disregard of corporate formalities in distributions he made to himself before execution of the workout may have some relevance to his responsibility for the obligations MKI assumed in the workout including its obligation to arbitrate.

First Options also pointed to some evidence of withdrawals after the workout documents were signed. Thus, it says Mr. Kaplan used a deceptive financing scheme to raise the $500,000 MKI agreed to and did contribute to the workout and that he falsely represented the source of that money. It points to other evidence that it says showed commingling after MKI resumed trading under the terms of the workout. First Options' witness, Mr. Murphy, testified that $100,000 was drawn out of MKI's trading account on December 21, 1988 and deposited into one of Mr. Kaplan's checking accounts that same day. Mr. Murphy went on to say Mr. Kaplan then transferred $100,000 from this checking account into another personal account on December 30, 1988. Then, on January 2, 1989, five checks were drawn on the latter personal account. They totaled just under $100,000

and were payable to a real estate joint venture in which Mr. Kaplan was interested.

All this must be balanced against the lack of any evidence from which we might infer Mr. Kaplan's general non-compliance with corporate formalities. Testimony before the arbitrators indicated MKI was validly incorporated, it elected officers and directors, it held regular board meetings and prepared minutes, enacted by-laws, issued share certificates, entered into contracts in its own name, filed tax returns in its own name, maintained corporate books and records and had its own corporate checking account.

We have said MKI's argument that pre-workout events are immaterial to this dispute may lose some force on the alter ego theory. We think this is so because of the element of fraud that lies at its core. Fraud is often a basis for setting aside or refusing to enforce an agreement. Thus, if Mr. Kaplan's corporation, MKI, were a sham that he fraudulently manipulated to First Options' detriment, it would deprive him of the limitation of his own obligations that he sought to accomplish through the workout. But if First Options is to rely on a fraud theory, it must swallow the bitter with the sweet. Because alter ego is akin to and has elements of fraud, we think it too must be shown by clear and convincing evidence. That kind of evidence is not present here. *See Carpenters Health & Welfare Fund,* 727 F.2d at 283. The record does not show Mr. Kaplan had a practice of culling profits from a failing company while creditors' attempts to seek payment were being rebuffed. Before the 1987 crash, MKI was a profitable entity from which Mr. Kaplan, as sole shareholder, had a right to draw profits. Moreover, this record does not show that corporate formalities were generally ignored. Alter ego status cannot be inferred whenever a shareholder withdraws some monies from a corporation without formally declaring a dividend or executing a note even if one of the withdrawals is made while the corporation is insolvent.[28] If it did, every payment to a stockholder during insolvency would justify piercing the corporate veil.

---

28. A withdrawal during insolvency could be void or voidable as a fraudulent conveyance, but First Options has never relied on that theory.

The most serious act that occurred before the workout is Mr. Kaplan's withdrawal of $611,000 from MKI during the eight weeks following the October 19, 1987 crash. MKI's books show it was indebted to Mr. Kaplan and these distributions were recorded on its books as "repayments of loans due shareholders." There is no evidence, testimonial or otherwise, which indicates the debt was fictitious. Indeed, the record indicates the contrary. It shows Mr. Kaplan had made loans totaling $1.4 million to MKI. Because MKI was apparently insolvent when the $611,000 was paid to Mr. Kaplan, these withdrawals may be voidable or even void as fraudulent conveyances, but we do not think they justify piercing the corporate veil. We think the proponent of an alter ego theory must show more than shown here.

This record does not show that MKI was a "sham" either pre- or post-workout. Instead, it shows that Mr. Kaplan had run a successful business venture until the crash. From it, before and after the crash, he had sometimes withdrawn funds for personal use without observing corporate formalities. With the exception noted, none of these withdrawals appear to have affected MKI's solvency or to have been made when it was insolvent. This record does not clearly and convincingly show that MKI was a sham Mr. Kaplan manipulated in fraud of its creditors.

The district court's finding that MKI was Mr. Kaplan's alter ego does not withstand review when the correct standard of independent judicial review of an arbitration panel's decision on its own jurisdiction is substituted for the incorrect standard of manifest disregard for the evidence that the district court used. Applying the proper standard, we conclude the Exchange did not have jurisdiction over the dispute between Mr. Kaplan and First Options concerning his individual liability to perform all of MKI's obligations, under the workout or otherwise, on a theory that they were alter egos.

The evidence in this record is insufficient to allow First Options to pierce MKI's corporate veil.[29]

## VII.

The order of the district court confirming the arbitration award against the Kaplans will be reversed. The record will be remanded to the district court with instructions to enter in its place an order vacating the arbitrators' award against the Kaplans. The order confirming the award as to MKI will be affirmed.[30]

Each party shall bear its own costs.

---

**29.** We do not imply that the arbitrators exhibited a manifest disregard for the law when they concluded on the merits that Mr. Kaplan and MKI were alter egos. Indeed, we express no opinion whatsoever on that issue. Before reaching it, a court must decide independently whether the arbitrators have jurisdiction.

**30.** The only argument MKI asserts to vacate the arbitration award against it is the arbitrators' and arbitration process's bias in favor of First Options. It says this made their award fundamentally unfair in violation of 9 U.S.C.A. § 10(a)(2) (West Supp.1993). *See* Brief for Appellants at 31. MKI alleges fourteen instances of such bias. In order to show "evident partiality," "the challenging party must show 'a reasonable person would have to conclude that the arbitra-

tor was partial' to the other party to the arbitration." *Apperson v. Fleet Carrier Corp.*, 879 F.2d 1344, 1358 (6th Cir.1989) (quotation omitted), *cert. denied*, 495 U.S. 947, 110 S.Ct. 2206, 109 L.Ed.2d 533 (1990). "Evident partiality" is strong language and requires proof of circumstances "powerfully suggestive of bias." *Merit Ins. Co. v. Leatherby Ins. Co.*, 714 F.2d 673, 681–82 (7th Cir.), *cert. denied*, 464 U.S. 1009, 104 S.Ct. 529, 78 L.Ed.2d 711 (1983), *mandate modified*, 728 F.2d 943 (7th Cir.1984). After review of the record, we conclude that the instances MKI cites, taken together, do not show "evident partiality." The district court's order confirming the arbitration award against MKI will be affirmed for the reasons given by the district court.