**In re BRANDYWINE RIVER HOTEL, INC., Debtor.**

**Bankruptcy No. 94–17733 SR.**

United States Bankruptcy Court,
E.D. Pennsylvania.

Jan. 19, 1995.

Frederic J. Baker, Asst. U.S. Trustee, Philadelphia, PA.

Aris J. Karalis, Philadelphia, PA.

Ellen M. McDowell, Berry & Martin, Philadelphia, PA.

Gretchen Santamour, Lesser & Kaplin, P.C., Blue Bell, PA.

Jonathan Petrakis, Frey, Petrakis & Deeb, Philadelphia, PA.

Kevin W. Gibson, Media, PA.

## OPINION

STEPHEN RASLAVICH, Bankruptcy Judge.

### Introduction.

Before the Court is a Motion of the above named debtor, Brandywine River Hotel, Inc. ("Brandywine Hotel") seeking a determination that putative creditor Suburban Federal Savings Bank ("Suburban Federal"), has no interest in the revenues and/or rents generated from Brandywine Hotel's operations or, in the alternative, for permission to use cash collateral pursuant to 11 U.S.C. § 363(c)(2)(B). The Motion, which challenges the existence of any interest in cash collateral on the part of Suburban Federal, is vigorously opposed by Suburban Federal which asserts that it does have an interest in cash collateral. Conversely, the challenge to the alleged cash collateral interest is supported by Meridian Bank ("Meridian"), the holder of a small secured claim which Brandywine agrees is secured, *inter alia*, by a cash collateral interest in rents from the hotel operation.

The Motion was brought on an expedited basis shortly after the Chapter 11 filing. An initial evidentiary hearing was held on December 2, 1994. That hearing resulted in an interim consensual agreement for the use of cash collateral pending a further hearing on December 22, 1994. At the latter hearing, the parties agreed to the admission of a stipulated record, consisting of 40 numbered exhibits, for the resolution of the instant Motion. Brandywine Hotel, Suburban Federal and Meridian have all submitted post-hearing memoranda of law and the matter is now ripe for adjudication. Having considered the evidence and the arguments of counsel, the Court has concluded that Suburban Federal has failed to demonstrate that it has an interest in cash collateral of the Bankruptcy estate and that Brandywine Hotel may, therefore, utilize the subject business revenues free from Suburban Federal's further claim to the contrary.

### Background.

Brandywine Hotel is a Pennsylvania corporation, the sole shareholders, officers and directors of which are Paul A. Geary, Jr. and Ann Marie Geary, husband and wife. Brandywine Hotel operates a hotel on real property located at Route 1 and Route 100, Chadds Ford, Delaware County, Pennsylvania. The real property is owned by the Chadds Ford Partnership, a Pennsylvania general partnership, the sole partners of which are also Paul and Ann Marie Geary, ("CFP"). Brandywine Hotel operates its business pursuant to the terms of a written Lease Agreement with CFP dated August 1, 1987, as amended (the "Lease"). (Exhibits 22 and 22A).

Suburban Federal is the holder of a first mortgage lien against the subject real estate and improvements (collectively "the Hotel Property") as security for an August 7, 1986 loan to CFP in the original principal amount of $2,660,000. (Exhibits 1 and 2). Suburban Federal also holds a second mortgage lien against the Hotel Property as partial security for a separate loan made to CFP on May 26, 1987, in the original principal amount of $300,000 (Exhibits 3 and 4). (The $300,000 loan is also secured by a first mortgage lien on contiguous realty and improvements known as the Barn Shops). Both Suburban Federal loan transactions, as well as the Lease, were entered into on behalf of CFP by Paul Geary, Joseph Grace and Joseph Coyle. In or about April 1991, Paul Geary acquired the partnership interests of Grace and Coyle, whereupon CFP was reconstituted as a partnership between Paul Geary and his wife Ann Marie. To finance the acquisition of the partnership interests of Grace and Coyle the Gearys borrowed $650,000 from Constitution Bank, which loan is apparently secured by a third and fourth mortgage on the Hotel Property.

Sometime in 1992, CFP fell into default with respect to payments due under the first and/or second mortgage loans with Suburban Federal. This led to the execution of a certain Modification Agreement, dated October 8, 1992, between Suburban Federal, the Gearys, CFP and Brandywine Hotel (the "Modification Agreement"). (Exhibit 5). Among the Modification Agreement's principal features was a guaranty by the Gearys of the CFP indebtedness, a restructuring of the mortgage loan repayment terms, and consents by the Geary's, CFP and Brandywine

Hotel to various financial covenants and restrictions with respect to the hotel operation. By late 1994, CFP was allegedly in default under the Modification Agreement, whereupon Suburban Federal commenced a civil action in the Court of Common Pleas of Delaware County against CFP based on the defaulted loans. Suburban Federal also named the Gearys and Brandywine Hotel as Defendants based on breaches of the Guaranty and financial covenants in the Modification Agreement. (Exhibit 38). Suburban Federal coupled with its Delaware County complaint an Emergency Petition for the appointment of a receiver for the affairs of both CFP and Brandywine Hotel. (Exhibit 39). The State Court granted the latter request and appointed as receiver an entity known as G.F. Management. That appointment of a receiver appears to have precipitated the initiation of this Chapter 11 case on November 23, 1994.

At the initial hearing in this matter on December 2, 1994, Suburban Federal asserted an interest in cash collateral based essentially on two theories. First, Suburban Federal relied on the assignment of rents and profits language found in each of its mortgages from CFP. The pertinent language, set forth identically on the first page of each mortgage, provides as follows:

Borrower does hereby mortgage, grant and convey to Lender the following described property located in Chadds Ford, Delaware County, Pennsylvania ... [reference to legal description] ... TOGETHER WITH, all the improvements now or hereafter erected on the property and all easements, rights, appurtenances, rents, royalties, mineral, oil and gas rights and profits, water rights, and stock and all fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument.

The instant hotel room rents, it was urged to this Court, fall within the ambit of the above clause.

Suburban Federal, in the second place, asserted that if the above argument failed to persuade by itself then, for a variety of reasons, including the present community of ownership between CFP and Brandywine Hotel, and an alleged disregard of corporate formalities, the Court should invoke what is sometimes referred to as the "mere instrumentality" doctrine, to treat the separate entities here (i.e., CFP and Brandywine Hotel) as one entity, and then give effect to the assignment of rentals language in the CFP/Suburban Federal Mortgages, citing *Steven v. Roscoe Turner Aeronautical Corp.*, 324 F.2d 157 (7th Cir.1963); *Fanfan v. Berwind Corporation*, 362 F.Supp. 793 (E.D.Pa. 1973).

At the December 2, 1994 hearing, the Court expressed some doubt that the assignment of rentals clause in the mortgages would alone suffice to establish Suburban Federal's interest for cash collateral purposes in any "rentals" other than the rent payable to CFP by Brandywine Hotel under the Lease. In other words, the Court did not view the assignment of rents language in the mortgage from CFP to Suburban Federal to permit the assignee, Suburban Federal, to look past the assignor CFP's lease with Brandywine Hotel and cause the assignment to attach to the *operating revenues* of CFP's tenant; at least not simply on the basis that because the tenant's business was that of a hotel, its revenues were characterizable as rents and therefore fell within the sweep of the Landlord/mortgagee's assignment of rents clause. The Court felt then, as it does now, that such a result would surely not follow if the tenant in question operated a retail store, or a service business, or any other type of business at the demised premises, and it does not concur with Suburban Federal that the result it desires should follow merely because of the type of business operated by its mortgagor's tenant. Suburban Federal has not provided the Court with controlling authority for its aggressive proposition, nor has the Court's own research identified such authority. In particular, the case of *Bulger v. Wilderman*, 101 Pa.Super. 168 (1931), originally cited as supportive of Suburban Federal's position, is clearly inapposite. In *Bulger*, the owner of an apartment complex defaulted under a mortgage containing an assignment of rents clause. The issue before that court was whether the owner/mortgagor's subsequent reassignment of

one of the individual apartment leases undermined the validity or effectiveness of the mortgagee's *prior* blanket assignment, such that a tenant who paid rent to the original mortgagee/assignee was nevertheless still liable for the same rent to the second assignee. The *Bulger* Court easily resolved that question in favor of the tenant, thereby upholding the primacy of the earlier in time blanket rent assignment. A situation analogous to *Bulger* would be one where CFP reassigned the lease between itself and Brandywine Hotel to a third party, which third party demanded that Brandywine Hotel pay to it rent under the Lease in derogation of Suburban Federal's rights under the original mortgage assignment. Those facts are not present herein. CFP has not "re-assigned" the Lease to a third party. CFP's tenant is simply using the property to operate a hotel. Again, therefore, the Court views *Bulger* as inapposite.

█ Perhaps in recognition of this, Suburban Federal, at both the December 22, 1994 hearing and in its post-hearing legal memoranda, conceded this issue. At this juncture, Suburban Federal argues exclusively that the facts and circumstances, as evidenced by the documentary record before the Court, are such that the Court should view CFP, Brandywine Hotel and the Geary's individually, as one single economic unit. Upon careful contrast of the allegations made against the evidence presented, the Court is not satisfied that Suburban Federal has proved its case. The Court will, therefore, reject Suburban Federal's assertion of an interest in cash collateral of Brandywine Hotel.

█ As the Third Circuit Court of Appeals indicated in *Kaplan v. First Options of Chicago, Inc.*, 19 F.3d 1503, 1521 (3rd Cir. 1994), the alter ego concept is a "tool of equity [that] is appropriately utilized when the court must prevent fraud, illegality or injustice, or when recognition of the corporate entity would defeat public policy or shield someone from public liability for crime," citing *Carpenters Health & Welfare Fund v. Ken R. Ambrose, Inc.*, 727 F.2d 279, 284 (3d Cir.1983). The corporate veil is pierced only when "the corporation was an artifice and a sham to execute illegitimate purposes and [an] abuse of the corporate fiction and immunity that it carries." *Wheeling–Pittsburgh v. Intersteel, Inc.*, 758 F.Supp. 1054, 1058 (W.D.Pa.1990), citing *Zubik v. Zubik*, 384 F.2d 267 (3d Cir.1967), *cert. denied*, 390 U.S. 988, 88 S.Ct. 1183, 19 L.Ed.2d 1291 (1968). Events that permit the corporate veil to be pierced include:

> "failure to observe corporate formalities, non-payment of dividends, insolvency of the debtor corporation at the time, siphoning of funds of the corporation by the dominant shareholder, non-functioning of their officers or directors, absence of corporate records, and the fact that the corporation is merely a facade for the operations of the dominant stockholder of stockholders."

*United States v. Pisani*, 646 F.2d 83, 88 (3d Cir.1981), quoting *DeWitt Truck Brokers v. W. Ray Flemming Fruit Co.*, 540 F.2d 681, 686–87 (4th Cir.1976). In addition, courts sometimes consider undercapitalization. *Id.* Not every disregard of corporate formalities or failure to maintain corporate records, however, justifies piercing the corporate veil. That remedy is available only if it is also shown that a corporation's affairs and personnel were manipulated to such an extent that it became nothing more than a sham used to disguise that alter ego's use of its assets for his own benefit in fraud of its creditors. In short, the evidence must show that the corporation's owners abused the legal separation of a corporation's owners, and used the corporation for illegitimate purposes. *See Zubik*, 348 F.2d at 270 n. 2.

Suburban Federal's "mere instrumentality" allegation's fall into a number of categories. In addition to the customary assertions that the subject entities failed to observe the requisite corporate formalities, and that the principals themselves treated the separate entities as one, Suburban Federal focuses on an April 1991 amendment to the Lease pursuant to which the Gearys reduced the rent payable from Brandywine Hotel to CFP. Since CFP has no business other than its ownership of the Hotel Property and the Barn Shops, CFP's only source of income is rent. The aforesaid reduction in Brandywine Hotel's rent apparently created a situation

where on the face of things CFP's income from rentals was insufficient to service the Suburban Federal and Constitution Bank debts. To meet mortgage payments and thus avoid default, the Gearys, it is argued, would have to resort to use of funds from the Hotel operations. Their willingness to engage in this sort of "commingling," Suburban Federal maintains, warrants treating CFP and Brandywine as a single enterprise. There is a degree of appeal to Suburban Federal's arguments but ultimately they fail to persuade.

Suburban Federal has always been aware of the bifurcated ownership interests of the realty versus the hotel business because this state of affairs existed at the time the Suburban Federal loans were made. Although there may have been the alleged commingling of funds, it occurred, if at all, only to some small degree. Alternatively, one might argue, the Gearys could have withdrawn funds from Brandywine Hotel in the form of dividends to themselves and "invested" those funds in CFP to enable it to make rental payments. This course might have produced other problems of its own, if, for instance, Brandywine Hotel were unable to pay its own creditors. While not endorsing the "dividend" approach, that alternative is worth noting, if only to indicate that the Gearys use of excess revenues from the Hotel operation in the fashion described does not strike the Court as especially egregious, since they possibly might have reached them anyway.

Similarly, while the Gearys attention to corporate "formalities" perhaps waned as their financial difficulties increased the record before this Court falls far short of evidencing the type of "sham" or "facade" which demands disregard of the separate existence of the two business entities. Certainly there is no "smoking gun" in this regard. There is, for example, no evidence that CFP and Brandywine Hotel do not each file their own separate tax returns or keep separate books. Numerous separate annual financial statements for each entity are contained in the Exhibit binder (See Ex. 31–35), and while these statements reflect declining profitability, that in itself is not evidence of the existence of an artifice to defraud Suburban Federal or anyone else.

Likewise, the amendment to the Lease permits no automatic conclusion of wrongdoing on the part of the Gearys, especially in the absence of other evidence confirming the alleged "below market" nature of the lease. If there was going to be a shortfall for CFP from rent collection, it could simply mean no more than that the Gearys would have to invest their own funds in CFP, presumably through profit distributions to them by Brandywine Hotel. It is also important in this regard to note that Suburban Federal's ability to exercise its state law collection rights was not affected by any of the acts and/or omissions of which Suburban Federal complains in this context. On the contrary, if CFP defaulted under the subject mortgages, the Bank could simply proceed to foreclosure. No argument to the contrary is made herein. Instead, Suburban Federal's principal grievance seems to be with the filing of the Bankruptcy itself, for that event *has* intruded on its rights to move forward, especially now that CFP has also filed for relief under Chapter 11. It is mainly the Bankruptcy filing and its cash collateral implications, coupled with the absence of a direct borrower/lender relationship between Suburban Federal and Brandywine Hotel, which impels Suburban Federal to argue for disregard of the distinction between the two entities. The Court appreciates Suburban Federal's anxiety over the repayment of the mortgage indebtedness. For a Bank its size this is apparently a relatively large problem loan. The Court notes too that Suburban Federal is moving forward aggressively in this Court, both by way of the instant motion, as well as with pending motions to dismiss the case and/or for relief from the automatic stay under 11 U.S.C. § 362. Without commenting on the merits of those other Motions, the Court will, at this juncture, merely indicate that, as the party with the burden of proof in the context of "piercing the corporate veil,"[1] Suburban Federal has failed to satisfy the Court that it should take the rather drastic step of collapsing CFP and Brandywine Hotel into one entity. For the

---

1. *See In re Nahas,* 161 B.R. 927 (W.D.Pa.1979).

foregoing reasons, the Debtor's Motion seeking a determination that Suburban Federal has no interest in the revenues and/or rents generated by the Debtor's operations will be granted. Accordingly, the alternative relief sought by the Debtor, for approval of use of cash collateral becomes moot.

In light of the above disposition it is not necessary to reach an additional issue discussed in their memoranda by Meridian, Brandywine Hotel, and Suburban Federal, however, brief mention of it is appropriate. Specifically, Meridian and Brandywine Hotel, both argue that, even if the corporate veil were pierced in this instance, Suburban Federal's claim to an interest in cash collateral must still be rejected because the pertinent language of its rent assignment clause does not encompass the hotel revenues at stake herein. (See description at Page 4, *supra.*) In this regard, neither Meridian nor Brandywine Hotel overlooks the relevant amendments enacted at Section 214 of the recent Bankruptcy Reform Act of 1994. (the "Reform Act").[2] These amendments, it is duly noted, refine the term "cash collateral" as used in 11 U.S.C. § 363, to include the "fees, charges, accounts or other payments for the use or occupancy of rooms and other public facilities in hotels, motels or other lodging properties" (collectively "Hotel Revenues"). Rather, Meridian and Brandywine Hotel argue, that the effect of the amendments is simply to permit a lender with a valid, but possibly less than fully perfected pre-petition security interest in Hotel Revenues, to now assert that such interest is preserved post-petition and that the Hotel Revenues constitute cash collateral. In this instance, Meridian and Brandywine Hotel both argue that Suburban Federal does *not* have a valid pre-petition security interest in Hotel Revenues because the assignment language in its mortgages includes only "rents, royalties, mineral, oil and gas rights and profits ..." In other words, Meridian and Brandywine Hotel argue that the assignment language in question would have to include specific reference to "fees, charges, accounts or other payments for the use or occupancy of rooms ... etc."

In this respect Meridian and Brandywine rely on this Court's own recent holding in *In re West Chestnut Realty of Haverford, Inc.,* 166 B.R. 53, 55–56 (Bankr.E.D.Pa.1993), *aff'd,* 173 B.R. 322, 324 (E.D.Pa.1994) wherein the Court sided with the majority of Courts nationwide in holding that hotel room charges are neither rentals nor profits of realty as that phrase is commonly understood in real estate parlance but are, rather, an interest of a different sort, possibly one subject to the perfection provisions of Article 9 of the U.C.C. The Reform Act, it is urged, did not alter this fact by expanding the definition of the term "rents."

■ Suburban Federal, takes issue with the foregoing and insists that the Reform Act's revisions to Sections 363 and 552(b) of the Bankruptcy Code are specifically intended to deal with circumstances such as those found herein. As noted, the Court's adverse finding on the corporate veil issue makes a determination of this issue unnecessary. However, the Court will indicate that it considers the arguments of Meridian and Brandywine Hotel in this regard to be convincing. There seems little question that the Reform Act was intended to include hotel rents in the category of assets which now constitute cash collateral and, furthermore, to additionally extend the same protection to hotel rents as is now extended to realty rents and profits; that is, by preserving that interest post-petition even where it has not been fully perfected under applicable state law say, for instance, due to a failure to deliver demand notices to tenants. It is less clear that the intention of Section 214 of the Reform Act is to completely eliminate any state law distinction between "rents" and "hotel revenues" such that an existing security instrument which makes reference to one asset is now automatically deemed to include the other. The legislative history of Section 214 does not support this conclusion[3] and given the recent passage of the Reform Act there is apparently yet no case law on the question. Suffice it to say that Suburban Federal's argument in this respect requires inferences that this Court is doubtful it would be pre-

---

**2.** Pub.L. 103–394, 1994.

**3.** 140 Cong.Rec. H10752–01, *H10768.

pared to make had a different result obtained on the issues hereinbefore addressed.

**In re SACRED HEART HOSPITAL OF NORRISTOWN, Debtor.**

**Bankruptcy No. 94–13275DAS.**

United States Bankruptcy Court, E.D. Pennsylvania.

Feb. 1, 1995.

See also 175 B.R. 543.

William Slaughter, Vincent J. Marriott, III, Ballard Spahr Andrews & Ingersoll, Philadelphia, PA, for debtor.

Edward C. Toole, Jr., Clark, Ladner, Fortenbaugh & Young, Philadelphia, PA, John J. Koresko, V, Koresko & Noonan, Norristown, PA, for movants.

Joel H. Levitin, Dechert Price & Rhoads, Philadelphia, PA, for creditors' committee.

Claudia Z. Springer, Duane, Morris & Heckscher, Philadelphia, PA, for Mun. Bonds Investors Ins. Co.

J. Gregg Miller, Pepper, Hamilton & Scheetz, Philadelphia, PA, for Midlantic Bank.

Paul E. Cherry, Wayne, PA, for Michelle D. Johnson.

W. Jeffrey Garson, Cohen, Shapiro, Polisher, Sheikman & Cohen, Philadelphia, PA, for AllMed Financial Corp.

Mark S. Halpern, Furman & Halpern, P.C., Bala Cynwyd, PA, for Skilled Nursing Professional Services.

Frederic Baker, Asst. U.S. Trustee, Philadelphia, PA.

## OPINION

DAVID A. SCHOLL, Chief Judge.

### A. INTRODUCTION

The instant motion seeks to have this court determine that counsel who has solicited the representation of over 100 former employees of a closed hospital debtor be permitted to file a class proof of claim for all other former employees, estimated by the Movants at about 700 additional persons, and effectively extend the bar date for employee creditors who have not yet filed claims in accordance with the class determination. While we agree with the Movants that a class proof of claim is an appropriate device in certain circumstances, we find that such circumstances are narrowly defined, and that the instant facts do not warrant the application of this device. In particular, we note that the putative class in issue was not certified by a nonbankruptcy court; there is no evidence that the Debtor excluded, or failed to provide proper notice to, the putative class members; and that extension of the bar date for employees only would not be equitable under the circumstances. Therefore, the Motion before us will be denied.

### B. PROCEDURAL AND FACTUAL HISTORY

Before the commencement of this bankruptcy case on May 25, 1994, SACRED HEART HOSPITAL OF NORRISTOWN ("the Debtor") operated an acute-care nonprofit hospital in Norristown, Pennsylvania. The Debtor alleges that it employed approximately 410 full-time and 371 part-time employees at the time of its closure, which occurred on May 18, 1994, and caused it to terminate substantially all of its employees.

The Debtor agrees that most of its full-time former employees, most of whom were allegedly paid all pre-petition wages due, were also entitled to receive payments for loss of certain fringe benefits, primarily vacation pay, which payments have not been made. As a result, the schedules and statement of financial affairs filed by the Debtor shortly after the commencement of the case reflect a total of $691,101 owed to 591 scheduled former employees of the Debtor.

However, the schedules do not reflect the extent to which such claims are entitled to priority under 11 U.S.C. § 507(a)(3), which would appear to require the former employees to file proofs of claim in order to obtain priority status of their respective claims. Also, no 60–day pre-termination notice was provided to any of the employees under the Worker Adjustment and Restraining Notification Act, 29 U.S.C. §§ 2101–09 ("WARN"), which the Movants allege gives rise to liability under that Act. Finally, the Movants claim that a total of 870 individuals are potential former employee-claimants, not only the 591 scheduled by the Debtor.

Just prior to the bankruptcy filing, on May 20, 1994, John J. Koresko, V, Esquire ("Koresko"), a Norristown sole practitioner who does some bankruptcy work in our court, took out a full-page advertisement in *The Times Herald,* a newspaper of general circulation in the Norristown area, advising employees of the Debtor of their right to assert claims against the Debtor and urging them to retain him to represent their interests on a contingent-fee basis. The day after this bankruptcy case was filed, on May 26, 1994, Koresko filed a motion on behalf of a former employee named Douglas K. Stiteler referencing a class-action lawsuit filed by Koresko on Stiteler's behalf on May 23, 1994, in state court, seeking, *inter alia,* to have an official committee of employee-creditors appointed and allowing him to represent that committee. A hearing was scheduled on this motion along with a hearing on the initial cash collateral motion in the case on May 31, 1994, but Koresko's motion was continued at that and several times thereafter and was ultimately withdrawn on August 3, 1994.

Meanwhile, probably as a result of the advertisement, Koresko was retained to represent approximately 120 of the Debtor's former employees, each for whom he filed individual proofs of claim in this case. Koresko also filed a purported class proof of claim on behalf of all former employees on June 28, 1994. On August 5, 1994, Koresko further filed a motion for authority to prosecute employees' claims against the Debtor on a class-wide basis to replace his motion which had been withdrawn on August 3, 1994. This motion was actively opposed by the United States Trustee and Michelle D. Johnson, a former employee who had obtained separate counsel. The Debtor, the Official Committee of Unsecured Creditors ("the Committee"), and the Debtor's largest creditor, Midlantic Bank, successor to Continental Bank, as trustee for bondholders, and its insurer (collectively, "the Bank"), all indicated that they did not oppose the motion insofar as it requested permission to file a class proof of claim. However, they did not support other endeavors which the motion suggested might be undertaken, such as the employees' attempting to purchase the hospital facility themselves with certain pension funds.

After a hearing on August 17, 1994, this court denied this motion, ruling as follows:

The motion is denied. Whether a class claim can be filed at all is open to question. In any event, the class claimant must meet the requirements of F.R.B.P. 7023 and F.R.Civ.P. 23 to proceed as class representatives [sic]. We find that there is insufficient evidence that the named party is typical of class members and we find no showing of adequacy of representation. Specifically, given proposed counsel's inexperience, erratic performance to date, and apparent lack of resources renders [sic] him of questionable ability to conduct this litigation and properly represent the class.

This ruling was based on our finding that Stiteler had no insight into Koresko's scheme, or any desire on his part, to purchase the hospital. We were also concerned that Koresko had acted improperly in sending all putative class members a letter stating that he would assume that they desired him to represent them, on a contingency basis, unless he heard from them within five days. We also considered Koresko's limited bankruptcy experience and his lack of any experience in actual class-action litigation. Finally, we found his failure to pursue his initial motion and his refiling another similar motion at a significantly later time, and his ill-conceived plan to purchase the hospital, as exhibitions of erratic behavior which would ill serve the class.

Koresko filed a motion to reconsider this denial of class treatment of employee-claims on August 26, 1994, but failed to serve all interested parties. The court therefore apparently lacked jurisdiction to consider it. See, e.g., Smith v. Evans, 853 F.2d 155, 157–62 (3d Cir.1988); and In re Campfire Shop, Inc., 71 B.R. 521, 523–24 (Bankr.E.D.Pa. 1987). After several continuances, that motion was subsequently withdrawn on November 16, 1994.

Meanwhile, administration of the case proceeded. On September 1, 1994, Montgomery County successfully bid $7.05 million for the Debtor's primary asset, its hospital facility. After a status hearing of September 13, 1994, the Debtor was ordered to file a plan and accompanying disclosure statement on November 22, 1994. This deadline date for filing the plan and disclosure statement was ultimately extended to January 13, 1995, and, after filings in accordance therewith, a disclosure statement hearing is now scheduled on February 8, 1995. An adversary proceeding by a pre-petition provider of nursing services to the Debtor to declare certain accounts receivable subject to a trust in its behalf was decided favorably to the Debtor in an Opinion of December 2, 1994, reported at 175 B.R. 543 (Bankr.E.D.Pa.1994). Another proceeding involving the secured status of the Bank was settled just prior to final briefing on December 16, 1994. Most contested issues in the case were therefore resolved by the year's end.

On October 13, 1994, this court entered an Order establishing December 30, 1994, as the bar date for filing proofs of claim in this case. On October 20, 1994, the Debtor notified all of its creditors, including all of its scheduled former employee creditors, of the bar date by sending them copies of the court's bar

date Order. In addition, the Debtor caused notice of the bar date to be published twice, in consecutive weeks, in *The Times Herald* and in *The Philadelphia Inquirer.* There has been no evidence presented tending to establish that any employee failed to receive actual notice of the bar date.

On December 19, 1994, over six months after the commencement of the case, four months after the denial of the first motion for authority to pursue employee claims on a class-wide basis, two months after dispatch of the bar date notice, and only eleven days before the bar date itself, the motion before us, entitled Motion of Nominal Representatives [including Candace Anders, Joanne Weaver, Joan Levanios, and Shirley Davis in addition to Stiteler; collectively, "the Movants"] for Leave to File a Class Proof of Claim, Class Certification, Authority to Pay Fees and Expenses Out of Class Claim Proceeds, and Extension of the Bar Date ["the Motion"] was filed. Named as co-counsel to Koresko, on the Motion and for the class, were Edward C. Toole, Jr., Esquire; Pace Reich, Esquire; and Pauline K. Morgan, Esquire, all for the bankruptcy department of a prestigious Philadelphia law firm, Clark, Ladner, Fortenbaugh & Young ("Clark"). The instant Motion was opposed by not only the United States Trustee and former employee Johnson, but also, presumably in light of the possibility that granting the Motion at this stage would require rethinking of certain aspects of the proposed Debtor's plan, by the Debtor, the Committee, and the Bank as well.

This court temporarily extended the bar date for all putative class members until January 4, 1995, when it could first hear the matter in light of the impending holidays. The only testimony at the hearing, from putative class member Anders and the Debtor's acting President, Terrence Cunningham, was extremely brief. Although a very sophisticated and well-educated individual, Anders testified that she would not have known of her rights to make a WARN or pension claim had she not retained counsel. Cunningham testified that he doubted whether any pension claims had merit. It was clear from this testimony that all employees were acutely aware of the Debtor's bankruptcy due to their loss of employment and the attendant publicity regarding this case. The Debtor advised that, as of the bar date, 178 employees had filed proofs of claim, 14 of whom allegedly did not have claims scheduled by the Debtor.

After the hearing, the court entered an Order stating that

> [t]he Bar Date shall not be extended further for any parties. Any extension of the Bar Date may result only from our granting the Motion or granting relief for cause shown in individual circumstances.

The interested parties were allowed until January 18, 1995 (proponents), and January 25, 1995 (opponents), to brief the Motion.

## C. DISCUSSION

### 1. CLASS PROOFS OF CLAIM MAY WELL BE APPROPRIATE WHERE THE CLASS IN ISSUE HAS ALREADY BEEN CERTIFIED IN NON–BANKRUPTCY PROCEEDINGS AND WHERE CLASS PROCEDURES ARE NECESSARY TO PROVIDE NOTICE TO A PARTICULAR CREDITOR BODY

Prior to the decision in *In re American Reserve Corp.,* 840 F.2d 487 (7th Cir.1988), commentators agree that there was a consensus among courts at every level that no sort of class proof of claim was cognizable in a bankruptcy case in any circumstances. L. Kaye, *The Case Against Class Proofs of Claim in Bankruptcy,* 66 N.Y.J.L.REV. 897, 900 (1991) ("Kaye"); and J. Wolfson, *Class Actions in Bankruptcy: A Clash of Policies Reconciled,* 5 BANKR.DEV.L.J. 391, 392–94 (1988) ("Wolfson"). Fairly characterizing the reasoning which prevailed prior to the decision in *American Reserve,* the Debtor argues that "a self-designated representative of a creditor" is not an entity permitted to file a claim pursuant to 11 U.S.C. § 501 or Federal Rules of Bankruptcy Procedure ("F.R.B.P.") 3001 and 3003. Cases supporting the Debtor's argument include *In re Standard Metals,* 817 F.2d 625 (10th Cir.1987), *vacated on reh. sub nom. Sheftelman v. Standard Metals Corp.,* 839 F.2d 1383 (10th Cir.1987), *cert. denied,* 488 U.S. 881, 109 S.Ct. 201, 102

L.Ed.2d 171 (1988); *In re Energy Resources Co.*, 82 B.R. 172 (D.Mass.1987); *In re Bicoastal Corp.*, 133 B.R. 252, 255 (Bankr. M.D.Fla.1991); *In re Thomson McKinnon Securities, Inc.*, 133 B.R. 39, 40 (Bankr. S.D.N.Y.1991); *In re Mechem Financial, Inc.*, 125 B.R. 151, 153 (Bankr.W.D.Pa.1991); *In re Allegheny International, Inc.*, 94 B.R. 877, 880 (Bankr.W.D.Pa.1988); *In re Peters*, 90 B.R. 588 (Bankr.N.D.N.Y.1988); *In re Vestra Industries, Inc.*, 82 B.R. 21, 22 (Bankr.D.S.C.1987); *In re Texaco, Inc.*, 81 B.R. 820, 826–27 (Bankr.S.D.N.Y.1988); *In re Electronic Theatre Restaurants Corp.*, 57 B.R. 147 (Bankr.N.D.Ohio 1986); *In re Continental Airlines Corp.*, 64 B.R. 874, 880 (Bankr.S.D.Tex.1986); *In re Johns–Manville Corp.*, 53 B.R. 346 (Bankr.S.D.N.Y.1985); *In re Baldwin–United Corp.*, 52 B.R. 146, 147 (S.D.Ohio 1985); and *In re Computer Devices, Inc.*, 51 B.R. 471 (Bankr.D.Mass.1985). Indeed, in a case arising under the Bankruptcy Act, the Third Circuit Court of Appeal held that a class proof of claim was not appropriate in a reorganization proceeding. *Securities & Exchange Comm'n v. Aberdeen Securities Co.*, 480 F.2d 1121, 1128 (3d Cir.), *cert. denied sub nom. Seligsohn v. Securities & Exchange Comm'n*, 414 U.S. 1111, 94 S.Ct. 841, 38 L.Ed.2d 738 (1973).

*American Reserve* involved a class proof of claim filed by the named representative of a class of policyholder-customers of the debtor insurance company in a class action commenced in state court over two years before the underlying bankruptcy case had been filed. 840 F.2d at 488. The court ultimately did no more than reinstate, on an interlocutory appeal, an order of the bankruptcy court which permitted a class action to be filed if the requirements of Federal Rule of Civil Procedure ("F.R.Civ.P.") 23 were met. *Id.* at 493–94. However, the rejection of the argument that the Code and Rules did not absolutely preclude class proofs of claim was not only unprecedented at the time, but also it turned out to be revolutionary. Since *American Reserve*, almost every court faced with a class proof of claim has not followed the earlier cases dismissing class claims out of hand, but has proceeded to analyze whether the class device is appropriately applied to that particular fact situation and whether the prerequisites of F.R.Civ.P. 23 have been satisfied in that particular instance.

This approach appears in the two other Courts of Appeals' decisions addressing the propriety of class claims after *American Reserve, Reid v. White Motor Corp.*, 886 F.2d 1462 (6th Cir.1989), *cert. denied*, 494 U.S. 1080, 110 S.Ct. 1809, 108 L.Ed.2d 939 (1990); and *In re Charter Co.*, 876 F.2d 866 (11th Cir.1989), *cert. denied*, 496 U.S. 944, 110 S.Ct. 3232, 110 L.Ed.2d 678 (1990). Both involved claims filed on behalf of class representatives in class actions pending in non-bankruptcy courts, which had, moreover, been certified pre-petition by those courts as proper class actions. *Reid*, 886 F.2d at 1463, *Charter*, 876 F.2d at 868. As had the court in *American Reserve*, the *Charter* court merely held that F.R.Civ.P. 23, through F.R.Civ.P. 7023, applied to a class proof of claim, and a determination that a class could not be certified in any event was remanded for that determination. 876 F.2d at 876–77. In *Reid*, the court affirmed a denial of class certification, holding that a class claim could be filed in certain circumstances, but that the particular class representative filing the claim before the court was ill-chosen and had proceeded in violation of F.R.Civ.P. 23 and F.R.B.P. 2019. 886 F.2d at 1470–72.

Several of the lower court decisions which have followed *American Reserve* have also not rendered actual determinations that class proofs of claim could be filed in those particular cases. In *In re Amdura Corp.*, 170 B.R. 445, 446, 453 (D.Colo.1994), a motion by representatives of a certified class was remanded for the bankruptcy court to decide whether to apply F.R.B.P. 7023 to allow a class claim or not. In *In re Wang Laboratories, Inc.*, 164 B.R. 401, 404 (Bankr.D.Mass.1994), the bankruptcy court, considering a claim by representatives who had filed a class action in federal district court, *sua sponte* "withdrew the reference" of the certification issue to the district. In *Wilson v. Valley Electric Membership Corp.*, 141 B.R. 309 (E.D.La. 1992), the district court merely denied a motion to dismiss the class representatives' motion for class certification on the ground that such a claim was totally impermissible.

Class proofs of claim were permitted to be filed in *In re Zenith Laboratories, Inc.,* 104 B.R. 659 (D.N.J.1989); *In re Chateaugay Corp.,* 104 B.R. 626 (S.D.N.Y.1989); and *In re Retirement Builders, Inc.,* 96 B.R. 390 (Bankr.S.D.Fla.1988). *Zenith,* 104 B.R. at 660, and *Retirement Builders,* 96 B.R. at 391, both involved classes certified by nonbankruptcy courts prior to filing, and the respective class representatives were authorized to represent the respective class members in bankruptcy court. *Chateaugay,* 104 B.R. at 627–28, involved a class action pending in a nonbankruptcy forum for over 18 months prior to the bankruptcy filing.

Both Kaye and Wolfson express concern about the clash of certain bankruptcy law principles with the utilization of the class-claim device. Kaye believes that the class device is simply irreconcilable with the requirement that every claimant must file a claim by the bar date, and, therefore, she disputes the wisdom of the holding in *American Reserve* that class claims can ever be filed. 66 N.Y.U.L.REV. at 928–31. Kaye also notes that the procedure to determine claims which a bankruptcy court may follow in a certified class proof of claim situation under F.R.Civ.P. 23(d)(2) will often simply replicate the bankruptcy case bar date process, rendering the class-claim issue an unnecessary intrusion. *Id.* at 931–32. Wolfson is more tolerant of *American Reserve,* but would confine its application to a situation "as was the case in *American Reserve,* where the debtor refuses to schedule or notify class members, . . ." 5 BANKR.DEV.L.J. at 427.

■ In light of the foregoing, we believe that the class proof of claim device may be utilized in appropriate contexts, but that such contexts should be chosen most sparingly. The situation where a class has been certified pre-petition by a nonbankruptcy court and the representative files a claim on behalf of a class of parties the adequacy of the representation of whose interests is uncertain, or where a class action has been filed a considerable time pre-petition and allowed to proceed as a class action in a nonbankruptcy forum, are the best candidates for such treatment. In these cases, it is very likely that certain procedures for notifying the unnamed class members about the class issue and the members' rights have been devised and followed pre-petition. In fact, it can be convincingly argued that it would be wasteful for the bankruptcy court, in its claims process, to either replicate any notice procedures already utilized in the nonbankruptcy court class-action process, or for the bankruptcy court to undertake to provide for different notices which could very well confuse unnamed class members to their unfair prejudice.

■ If the F.R.Civ.P. 23 or like requirements have been deemed satisfied by a nonbankruptcy forum, it seems likely that the class representatives will be deemed by the bankruptcy court to meet those requirements as well. The issue may even be deemed *res judicata.* However, in cases where the class action and the class's representation have not been certified pre-petition by the nonbankruptcy forum, there is little doubt that the bankruptcy court must rigorously examine whether the class representative in the bankruptcy case meets those requirements.

■ Finally, even if the foregoing requirements are met, the bankruptcy court must weigh the issue of whether it is appropriate to give the class members what may amount to an additional opportunity to meet an otherwise applicable bar date. If the unnamed class members are largely a group which the debtor has refused to notify individually, as Wolfson indicates was true of the class members in *American Reserve,* or if they are in large part what this court referred to as "unknown creditors" in *In re West Coast Video Enterprises, Inc.,* 174 B.R. 906, 909–10 (Bankr.E.D.Pa.1994), then the class device may provide the only form of notice to such parties and be advisable to utilize. On the other hand, if the putative unnamed class members have clearly received actual or constructive notice of the bankruptcy case and the bar date, denial of the implementation of the class proof of claim device appears advisable.

■ Finally, the impact of the timing of the filing of a class claim or motion on any bar dates established in the bankruptcy case must be considered. Known claimants of all

kinds who have received actual notice of the bar date must proceed through the claims process on a level playing field. Tinkering with an established bar date may raise due process claims of parties who have timely filed claims by originally-established bar dates, since it gives late filers a second bite at an apple which is likely to be less than fully satisfying, and thus effect unfair diminution of the timely filer's share of a distribution. On the other hand, bar dates are generally not binding on known creditors who have not received appropriate notice of bar dates, and they may not be binding on unnotified unknown creditors. Therefore, a class claim and motion which has the effect of expanding the bar date for unnotified creditors is often appropriate to comport with due process of law and expand the scope of a debtor's bankruptcy discharge. On the other hand, an action which expands the bar date for notified creditors may itself violate due process.

■ Timing is also significant. The most propitious time for filing a motion for class recognition is before a bar date is established, since the bar date is effectively uprooted in part by an extension of the bar date for a favored class of creditors. It is clearly disruptive to the formulation of a plan to frustrate a debtor's logical assumptions regarding the amounts of total claims by compelling the debtor to alter or extend an established bar date. It is regretful enough if this disruption occurs as a result of a debtor's belated enlightenment regarding a previously unknowable or unknown claim, or an error by the debtor in providing notice. Thus, clearly, a mere dispensation requested by a creditor or a group of creditors is not a basis to justify such disruption.

## 2. THE INSTANT MOTION MUST BE DENIED

■ Applying the foregoing concepts to the instant facts leads rather clearly to the conclusion that the instant Motion must be denied.

First, we note that the putative class and its representatives has never been certified as appropriate by a nonbankruptcy court. It is true that Koresko filed a pre-petition state court class action on behalf of virtually the identical class of former employees which are the focus of the Motion and that the certification process was stayed by the Debtor's bankruptcy filing. However, the state court class action preceded the instant bankruptcy filing by only two days. It is impossible to draw any inferences in favor of the propriety of the class or its representative from this history. We note that none of the cases which have allowed class proofs of claim have been confronted with a "virgin class" comparable to the instant putative class.

The presence of such a "virgin class" necessitates heightened analysis of whether F.R.Civ.P. 23 requirements are satisfied here. In our Order of August 17, 1994, we distinctly held that the movant failed to meet the typicality and adequacy of representation requirements of F.R.Civ.P. 23(a)(3) and (a)(4), respectively. Given the puny record made on the Motion at the hearing of January 4, 1995, there is some real force to the Debtor's argument that the "law of the case" doctrine, see *In re River Village Associates*, 161 B.R. 127, 134 (Bankr.E.D.Pa.1993); and *In re Cole*, 89 B.R. 433, 436 (Bankr.E.D.Pa. 1988), should bar a finding that the F.R.Civ.P. 23 requirements are now satisfied, thus precluding the Motion from being granted by allowing a different disposition than we reached on August 17, 1994, on virtually the same motion and record. Apparently, it is the Movants' position that the mere presence of the sophisticated Anders and the well-qualified Clark firm in contrast to the unsophisticated Stiteler and inexperienced Koresko are sufficient to give a different turn to the instant picture, as compared to that on August 17, 1994.

Without deciding the F.R.Civ.P. 23(a)(3), (a)(4)/"law of the case" issue at this juncture, we will proceed to discussion of the decisive issue of weighing the effect of extending the bar date for the former employees who have not filed proofs of claim by rendering them unnamed members of the putative class. We find that most, if not all, of the unnamed class members have had unusually stark, clear, and hence effective notice of the Debtor's bankruptcy case as a result of the abrupt loss of their employment, followed by intense

media publicity surrounding the filing itself and the sale of the Debtor's hospital facility to Montgomery County. Moreover, the Debtor claims to have provided actual notice of the bar date to all known class members. If, as the Movants apparently contend, the Debtor missed several potential claimants, it is doubtful that Koresko's own media blitz and mailings missed them. The instant facts therefore suggest that what is before this court is quite at the opposite end of the spectrum from the situation in *American Reserve,* where Wolfson found that no notice of the bankruptcy or the bar date was given to the putative unnamed class members at all.

The timing of the filing and prosecution of the Motion and its predecessor also weighs heavily against the Movants. Although Koresko seems to have understood the significance of active participation in this bankruptcy case from its outset, he somehow let the disposition of the class issue drift from the earliest days, when it was premature, to later, crucial stages in the case, without resolution. After the denial of the initial motion seeking permission to prosecute a class claim on August 17, 1994, the shortfalls of his efforts became quite obvious. Nevertheless, although the reconsideration motion was filed, it was crucially not properly served and was dropped only after three critical months, during which numerous significant events in the case occurred, had passed. Then, despite Clark's apparent participation as co-counsel in November, the instant Motion, with Clark as its visible new proponent, was filed only at the eleventh hour, eleven days before the bar date was to run and just prior to the holiday season, which rendered immediate scheduling of a hearing predictably problematical.

It is very difficult to explain the strategy of these actions, unless there was an attempt to create an emergency which would strike the court's sympathy in favor of the otherwise compelling circumstances of the Debtor's ex-employees. However, this course of events would cause the granting of this Motion to effect very substantial and apparently unwarranted disruption to the administration of the Debtor's bankruptcy case, in which

there is presently a plan before us for imminent confirmation. In light of the foregoing circumstances, we continue to doubt whether Koresko, even with Clark as his last-minute partner, has made out a compelling case of adequacy of his/their representation of the putative class, even though other elements of F.R.Civ.P. 23 might easily be satisfied. *See Baby Neal v. Casey,* 43 F.3d 48, 54–63 (3d Cir.1994); *In re Young,* 1994 WL 88992, slip op. at *3 (Bankr.E.D.Pa. March 11, 1994); and *In re Watts,* 76 B.R. 390, 396–401 (Bankr.E.D.Pa.1987), *aff'd,* 93 B.R. 350 (E.D.Pa.1988), *rev'd on other grounds,* 876 F.2d 1090 (3d Cir.1989) (commonality and typicality appear satisfied, despite variety in fact patterns of individual class members, as long as a core of common issues among class members exists).

In any event, it is manifestly clear that it would be unwarranted, unfair, and possibly violate the due process rights of other creditors of the Debtor to effectively extend the bar date to benefit (1) the members of the putative class who failed to exercise vigilance; and (2) the pocketbook of the putative class's counsel, who obviously will seek a contingency fee from all unnamed class members who fail to opt out of the putative class. As Johnson's opposition throughout the efforts to prosecute a class claim manifest, the Motion could have the effect of penalizing vigilant employees to the benefit of those who ignored their known rights and their arguably opportunistic counsel.

■ We note that the Debtor and the Bank, in their respective briefs in opposition to the Motion, have suggested that a class certification might properly be authorized by this court if the class definition were confined to employees who have actually filed proofs of claim. This court is disinclined to grant the Motion, even in this truncated form, for several reasons. One is that the Movants have not requested this alternative relief, and we think that it may be ill-advised for us to grant them a limited relief which they may not want. Second, we are not clear what such an order would accomplish. It would not expand the number of former employee-creditors or extend the bar date as to them, which is the main practical thrust of the

Motion. If the goal is to try like issues of WARN or pension claims of many former employees in one, as opposed to numerous, trials, we are certain that common counsel can easily devise a method to accomplish this end whether we certify a class or not. If not, the court would probably devise a method to do so itself.

### D. CONCLUSION

For all of the reasons set forth herein, the Motion in issue is denied in its entirety in a separate Order.

In re J & JB, INC., d/b/a Subway, Debtor.

DOCTOR'S ASSOCIATES, INC.; Subway Real Estate Corp.; and Subway Restaurants, Inc., Movants,

v.

J & JB, INC., d/b/a Subway; and Stanley G. Makoroff, Esquire, Trustee, Respondents.

Bankruptcy No. 93–23535–BM.
Motion Nos. 94–1279M, 94–1280M and 94–1281M.

United States Bankruptcy Court, W.D. Pennsylvania.

Dec. 21, 1994.

Stephen J. Jurman, McCann Garland Ridall & Burke, Pittsburgh, PA, for Doctor's Associates, Inc., Subway Real Estate Corp., Subway Restaurants, Inc.

John R. Banke, II, Monroeville, PA, for debtor J & JB, Inc., James A. Brown.

Stanley G. Makoroff, Trustee, Mark S. Seewald, Sable Makoroff & Gusky, P.C., Pittsburgh, PA.

### MEMORANDUM OPINION

BERNARD MARKOVITZ, Bankruptcy Judge.

Several matters are before the court at this time.

Doctor's Associates, Inc. has brought a motion (at No. 94–1279M) seeking payment as an administrative expense of postpetition

royalties and advertising fees that accrued pursuant to certain franchise agreements.

Subway Real Estate Corporation and Subway Restaurants, Inc. have brought motions (at Nos. 94–1280M and 94–1281M, respectively) seeking payment as an administrative expense of postpetition rentals that accrued pursuant to certain subleases.

The chapter 7 trustee does not object to payment of the requested chapter 11 administrative expenses. He does, however, strenuously object to payment of the requested chapter 7 administrative expenses. According to the chapter 7 trustee, the bankruptcy estate is not liable for these expenses because debtor never had a contractual relationship with movants.

Though the trustee does not fully express his position, it appears to the court that he argues that he never indicated a willingness to run this business in chapter 7; he never requested the court grant him authority to run the business in chapter 7; and the court never authorized or directed him to run the business in chapter 7. To the contrary, the trustee took action against the principals of the debtor to assure all parties in interest that this estate would incur no further chapter 7 administrative debt.

Movants concede that debtor never had a contractual relationship with them but argue that the bankruptcy estate nonetheless is liable for the requested chapter 7 administrative expenses because debtor ratified the contracts and enjoyed the benefits thereof during the chapter 7 phase of this case.

Movants' request for payment of postpetition expenses will be granted in part and denied in part. Their request for payment of chapter 11 administrative expenses will be granted because it is unopposed. However, their request for payment of chapter 7 administrative expenses will be denied. The trustee's objection thereto will be sustained.

## I

### FACTS

On June 1, 1987, James L. Brown, James A. Brown and Doctor's Associates, Inc. entered into a franchise agreement for operation of Subway Sandwich Shop franchise # 3217 at Boulevard Plaza in Monroeville, Pennsylvania. On August 21, 1987, James L. Brown and James A. Brown entered into a sublease with Subway Restaurants, Inc. for operation of the franchise at that location.

Shortly thereafter, in September of 1987, James L. Brown and James A. Brown formally incorporated J & JB, Inc.

On October 20, 1987, James L. Brown and James A. Brown entered into a second franchise agreement with Doctor's Associates for operation of Subway Sandwich Shop franchise # 3837 at McIntyre Square in Ross Township, Pennsylvania.

James L. Brown and James A. Brown entered into a third franchise agreement with Doctor's Associates on August 23, 1988 for operation of Subway Sandwich Shop franchise # 5207 at Holiday Center, Monroeville, Pennsylvania. On August 10, 1989, James L. Brown and James A. Brown entered into a written sublease with Subway Restaurants, Inc. for operation of the franchise at the Holiday Center location.

On September 15, 1990, James L. Brown, James A. Brown, and Joyce A. Brown entered into another franchise agreement with Doctor's Associates for operation of Subway Sandwich Shop franchise # 10316 at Edgewood Center in Edgewood, Pennsylvania. These same individuals had entered into a written sublease with Subway Real Estate Corporation on August 30, 1990, for operation of the franchise at that location.

On January 22, 1993, James L. Brown and James A. Brown entered into a written sublease with Subway Real Estate Corporation for operation of franchise # 3837 at the McIntyre Square location.

Debtor J & JB, Inc. was not a party to any of the above agreements. The Browns entered into all of these agreements in their individual capacities and on their own behalves, not on behalf of J & JB, Inc. At no time did the Browns assign their rights under these agreements to J & JB, Inc.

On October 6, 1993, a joint voluntary chapter 11 petition was filed at Bankruptcy No. 93–23535–BM by J & JB, Inc., James L.

Brown, James A. Brown, and Joyce A. Brown, doing business as Subway.

All four Subway franchises continued to operate during the chapter 11 proceeding. The role of J & JB, Inc. in the operation of the franchises prior to or subsequent to October 6, 1993 is unexplained.

On January 6, 1994, the United States of America brought a motion to dismiss for want of subject-matter jurisdiction. It argued that this court lacked jurisdiction under the Bankruptcy Code over a joint case filed by a corporation and three individuals. It asked that, at a minimum, the parties depriving the court of jurisdiction be dismissed from the case.

In response to the motion by the United States, J & JB, Inc. moved on January 26, 1994, to sever the individual debtors from its case. An order was issued on February 8, 1994, granting the motion of J & JB, Inc. and, accordingly, the Browns were no longer debtors herein.

On February 10, 1994, a rule to show cause was issued why the case should not be converted to a chapter 7 proceeding due to debtor's apparent inability to reorganize.

James L. Brown and Joyce A. Brown filed a voluntary joint chapter 13 petition on March 1, 1994 at Bankruptcy No. 94–20608–JKF.

The present case was converted to a chapter 7 proceeding on March 15, 1994, when debtor conceded that conversion to chapter 7 was appropriate. The order converting the case also directed debtor to file a list of all postpetition claimants.

A chapter 7 trustee was appointed on March 16, 1994. At no time did the chapter 7 trustee request permission pursuant to § 721 of the Bankruptcy Code to operate the business of debtor J & JB, Inc. on an interim basis during the chapter 7 proceeding.

James L. Brown and Joyce A. Brown, individual debtors at Bankruptcy No. 94–20608–JKF, continued to operate the four franchises and did business as Subway subsequent to conversion to chapter 7 in this case and during their own chapter 13 case.

During this time, James L. Brown and Joyce A. Brown sought to use the listed telephone numbers for the Subway franchises. The chapter 7 trustee in this case took the position that the listings of those numbers were assets of the estate of J & JB, Inc. and refused to authorize the transfer of those listings to the Browns or to abandon them without an order of this court authorizing him to do so.

On April 13, 1994, debtor J & JB, Inc. filed a motion to direct the chapter 7 trustee to withdraw an alleged directive to the telephone company to cease providing service to the Browns under the numbers in question. According to the Browns, the phone listings were being utilized by them individually while they were operating their own business pursuant to franchises which they individually owned.

An order was entered after a hearing on April 15, 1994, which authorized the chapter 7 trustee to abandon the disputed telephone numbers. Furthermore, it stated that any obligations arising out of the use of the numbers after October 6, 1993, would be the obligation of James L. Brown and Joyce A. Brown only.

On May 23, 1994, an order was entered dismissing the chapter 13 case of James L. Brown and Joyce A. Brown at Bankruptcy No. 94–20608–JKF as of June 1, 1994. The order also directed the chapter 13 trustee in that case to turn over to the chapter 7 trustee in this case all funds received from the Browns during their chapter 13 case. The directive was based on the Browns' representation at the § 341 meeting of creditors that all funds in the hands of the chapter 13 trustee had been generated from their operation of J & JB, Inc. That same order also directed the Browns to turn over to the chapter 7 trustee in this case all funds under their control that were generated by the business operations of J & JB, Inc., as well as any funds they generated while doing business individually as Subway franchisees. The court made no finding as to when the funds were generated. Specifically, the court did not determine that the funds were generated while debtors's principals were in chapter 13 or consider whether they were

earned prepetition or during the period debtor was in chapter 11 or after conversion to chapter 7.

The Browns ceased operating the four Subway franchises and vacated the premises between April of 1994 and June of 1994.

On August 9, 1994, Doctor's Associates, Subway Real Estate Corporation, and Subway Restaurants, Inc. filed motions for payment of postpetition expenses that are before the court at this time.

Doctor's Associates seeks payment (at Motion No. 94–1279M) of royalties and advertising fees as postpetition expenses. Specifically, it seeks payment of $36,134.67 as a chapter 11 administrative expense and payment of $21,682.06 as a chapter 7 administrative expense.

Subway Real Estate Corporation seeks payment (at Motion No. 94–1280M) of unpaid rent as a postpetition expense. Specifically, it seeks payment of $27,241.99 as a chapter 11 administrative expense and payment of $17,445.89 as a chapter 7 administrative expense.

Subway Restaurants, Inc. also seeks payment (at Motion No. 94–1281M) of unpaid rent as a postpetition expense. Specifically, it seeks payment of $29,407.74 as a chapter 11 administrative expense and payment of $8,613.06 as a chapter 7 administrative expense.

The chapter 7 trustee asserted in response to the above motions that debtor's estate is not liable for the expenses incurred subsequent to conversion to chapter 7 because debtor never operated or sought authority to operate in chapter 7 and because debtor did not have a contractual relationship with movants.

An evidentiary hearing was held on the motions and the chapter 7 trustee's objection thereto. All parties were given an opportunity to offer evidence on the issues before the court. At the hearing, the trustee asserted that he did not object to payment of the above expenses incurred during the chapter 11 phase of the case. He remained opposed, however, to the requests for payment of expenses incurred subsequent to conversion to chapter 7 on March 15, 1994.

## II

### ANALYSIS

Section 721 of the Code provides as follows:

The court may authorize the trustee to operate the business of the debtor for a limited period, if such operation is in the best interest of the estate and consistent with the orderly liquidation of the estate.

11 U.S.C. § 721.

The trustee in the present case did not request permission and did not receive authorization pursuant to § 721 to operate debtor's business subsequent to conversion. To the contrary, the trustee endeavored to assure that debtor would not incur any chapter 7 administrative expenses when he refused to authorize the telephone company to transfer debtor's phone numbers to debtor's principals.

It is undisputed that no privity of contract existed between debtor and the movants. The franchise agreements and subleases were executed by debtor's principals in their individual capacities. They did not execute the agreements as officers of J & JB, Inc. and did not assign their rights under these agreements to debtor. When debtor's principals continued operating under the agreements after the filing of the chapter 11 petition, they did so in their own right.

The issue before the court is whether debtor's bankruptcy estate is liable to movants for royalties, advertising fees, and rentals for the period subsequent to conversion to chapter 7 even though debtor did not operate its business in chapter 7 and was not a party to any of the franchise agreements or subleases with movants.

As noted, the chapter 7 trustee has conceded that expenses incurred during the chapter 11 phase of the case are allowable but steadfastly objects to the request for payment of such expenses incurred after conversion to chapter 7.[1] According to the

---

chapter 11 administrative expenses is that little or nothing will be available for distribution to chapter 11 administrative claimants after distri-

bution is made for chapter 7 administrative expenses.